## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

| | |
|---|---|
| GREYSTONE SERVICING COMPANY LLC, <br> 419 Belle Air Ln., <br> Warrenton, VA 20186, <br><br> Plaintiff, <br><br> v. <br><br> CWCAPITAL ASSET MANAGEMENT LLC, <br> 900 19th St. NW, 8th Floor <br> Washington, DC 20006, <br><br> and <br><br> DAVID KING, <br> 220 E. Bellefonte Ave. <br> Alexandria, VA 22301, <br><br> Defendants. | Civil Action No. 1:26-cv-2014 <br> JURY TRIAL DEMANDED |

## VERIFIED COMPLAINT

Plaintiff Greystone Servicing Company LLC ("Greystone") files this Verified Complaint against Defendant CWCapital Asset Management LLC ("CW") and Defendant David King ("King" and together with CW, "Defendants"), and hereby alleges as follows:

## NATURE OF THE ACTION

1. This case arises from a calculated and coordinated scheme orchestrated by Defendants to acquire the assets of Greystone's Special Servicing Division ("SSD") without purchasing the business itself.

2.    CW held itself out as a prospective purchaser of the SSD during Greystone's SSD sale process and sought access to confidential diligence materials concerning the business. But CW was never granted access to those materials because Greystone refused to accept CW's proposed condition to executing a non-disclosure agreement: that CW be exempt from a standard non-solicitation provision prohibiting the poaching of Greystone's SSD personnel.

3.    Upon information and belief, CW's interest in preserving the ability to recruit SSD personnel was not incidental. Rather, CW was working with King to position itself to obtain SSD employees, confidential information, client relationships, and servicing business.

4.    Greystone's SSD depends on specialized personnel, longstanding client relationships, and confidential business information, including pricing strategies, client-specific data, and proprietary servicing models. Defendants targeted those same assets. But rather than pay for them, CW conspired with King to take them from Greystone for itself.

5.    At the center of Defendants' scheme is King, a former Managing Director within the SSD. Through that role, King had access to highly sensitive information concerning Greystone's clients, personnel, pricing, and the structure and value of the SSD. Indeed, King was intimately involved in Greystone's exploration of a potential sale of the SSD (the "Proposed Transaction"), including outreach to prospective purchasers, familiarity with the contents of the Proposed Transaction's data room, and awareness of the material terms of the transaction. Under the terms of his agreement with Greystone and Greystone's employee manual, King was subject to non-solicitation and confidentiality obligations. As alleged herein, King violated those obligations in carrying out his scheme with CW.

6.    Upon information and belief, after CW failed to obtain access to Greystone's confidential diligence materials through the sale process, King became the means by which CW

2

obtained substantially the same information. Upon information and belief, King was discussing securing his own position with and employment by CW and offered Greystone's confidential information as an incentive. As alleged below, King transmitted numerous confidential and trade-secret files to himself in the days leading up to his resignation from Greystone and just before joining CW, which thereafter hired multiple additional SSD employees and began leveraging those personnel and Greystone's confidential and trade-secret information in (successfully) soliciting SSD clients. These events were not coincidental but were part of a coordinated effort to acquire the assets and value of the SSD without paying Greystone for them.

7.      The scheme unfolded in stages. First, King recruited Jason Price ("Price"), a Greystone employee King had originally brought into the business, who in turn recruited Mary English ("English"), another Greystone employee, to CW. English then aided in King's recruitment of yet another Greystone employee, Greg Frederking ("Frederking") and other Greystone personnel (King, Price, English, and Frederking are referred to collectively herein as the "Former Employees"). These individuals were not randomly situated employees; each held roles within the SSD that involved client-facing responsibilities, servicing operations, and/or access to Greystone's confidential and proprietary information.

8.      Second, Defendants used the Former Employees—together with Greystone's confidential information and trade secrets—to solicit Greystone's SSD clients and divert special servicing business to CW. Through their prior roles at Greystone, the Former Employees possessed detailed knowledge of Greystone's client relationships, pricing, servicing structures, and internal models, and King and CW used that information to identify, target, and secure the transfer of Greystone's special servicing business to CW.

3

9.      The scheme succeeded almost immediately. On May 18, 2026, the same day Frederking began working at CW, King communicated to a Greystone client that CW had "just brought Greg [Frederking] over for the AM component" and was "doing some diabolical stuff on that front." Within days, the process began for replacing Greystone with CW on special servicing assignments representing approximately 50% of Greystone's non-agency third-party portfolio, with additional client relationships at risk.

10.     This was not lawful competition. It was the execution of a coordinated plan to use Greystone's own employees, relationships, and proprietary information to replicate key components of Greystone's special servicing business at CW—without paying Greystone for it.

11.     Defendants launched this scheme at a critical time. At the time of these events, Greystone was in the midst of the Proposed Transaction to sell the SSD pursuant to a signed asset purchase agreement (the "APA") after extensive negotiations with C-IV Asset Management LLC (the "Buyer"). The assets being sold—including client relationships, contractual rights, and proprietary information—as well as the exclusive employment of key personnel, are the very assets and individuals that Defendants targeted.

12.     The consequences were immediate and severe. As a direct result of Defendants' conduct, Greystone lost a "Key Transferred Employee" (Frederking) designated under the APA,[1] saw substantial special servicing assets transferred to its competitor CW and suffered erosion of client relationships underlying the SSD. Specifically, Greystone has lost a substantial amount of business from two of its largest special servicing clients: 400 Capital Management, LLC ("400 Capital") and Prime Finance Advisor, L.P. ("Prime"). In response to these developments, which

---

[1]      The APA identifies several individuals as "Key Transferred Employees" and requires a certain number of those Key Transferred Employees to accept employment with the Buyer before closing.

triggered the failure of closing conditions, the Buyer demanded a material renegotiation of the terms of the APA, including seeking an approximately forty percent (40%) reduction in purchase price, reflecting the diminished value of the SSD business and assets caused by Defendants' actions. The value that was diverted was not abstract. It included continued employment of key personnel, client relationships, servicing assignments, and the very non-public portfolio, fee, and strategy materials King extracted from Greystone's systems before his departure from Greystone.

13.    Defendants undertook, and continued, this conduct despite being placed on notice of their contractual obligations and violations thereof through cease-and-desist letters issued in February 2026 and again in May 2026.

14.    Through this coordinated scheme, Defendants have not merely competed with Greystone—they have used Greystone's own confidential information, personnel, and goodwill to misappropriate Greystone's business and to undermine a pending transaction involving the sale of that business subject to the APA. Greystone brings this action to halt Defendants' ongoing misconduct, to protect its confidential information, employees, and client relationships, and to recover the substantial damages caused by Defendants' unlawful scheme.

## **PARTIES**

15.    Plaintiff Greystone Servicing Company LLC is a limited liability company organized and existing under the laws of Delaware, with its principal place of business in Virginia with the main office for the SSD business and other significant business operations in Texas.

16.    Upon information and belief, Defendant CWCapital Asset Management LLC is a limited liability company organized and existing under the laws of Delaware with its principal place of business in the District of Columbia and significant business operations in Texas—where, upon information and belief, Price, English, and Frederking reside—and New York.

17.     Defendant David King is a former Managing Director of Greystone who, upon information and belief, resides in Alexandria, Virginia.

## JURISDICTION AND VENUE

18.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, including 18 U.S.C. § 1836(c).

19.     This Court has supplemental jurisdiction over the remaining claims asserted herein pursuant to 28 U.S.C. § 1367 because they arise from the same nucleus of operative facts as the federal claim.

20.     This Court has personal jurisdiction over King because King resides in this District.

21.     This Court has personal jurisdiction over CW because, among other things, it maintained and directed contact to King, thereby directing suit-related communications into Virginia and conspired with King while he was in Virginia, the object of such conspiracy included misappropriating Greystone's trade secrets and confidential information. CW also transacts substantial business in Virginia by hiring employees, including King, and contracting for and providing special servicing within the Commonwealth.

22.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2).

## FACTUAL BACKGROUND

### *Background of Special Servicing Division*

23.     Greystone's Special Servicing Division (SDD) is a valuable, niche component of Greystone's commercial real estate finance and loan servicing business and provides services to clients across the United States.

24.     In general terms, special servicing involves the management and resolution of distressed or non-performing commercial real estate loans. Unlike routine loan servicing, which is

more administrative in nature, special servicing requires ongoing, strategic oversight of complex assets experiencing financial distress, default, or restructuring. The work performed by Greystone's SSD therefore extends well beyond administrative functions and includes negotiating with borrowers, developing and executing restructuring strategies, managing foreclosures, overseeing asset dispositions, and coordinating with investors and other stakeholders whose financial interests are tied to the performance of the underlying assets.

25.     Through these activities, Greystone's SSD manages loans and assets across large and sophisticated portfolios, involving securitized transactions and institutional investors. This work demands detailed, asset-level knowledge, real-time judgment, and sustained engagement with counterparties whose expectations and investment objectives must be navigated carefully to preserve value. Because of the nature of this business, the SSD is inherently relationship-driven and heavily dependent on the experience and judgment of the personnel who operate it. The success of the SSD does not turn solely on formal contracts or servicing rights, but on the ability of Greystone's professionals to cultivate and maintain relationships with clients, to understand the history and nuances of specific assets and portfolios, and to apply proprietary strategies developed through years of experience. In turn, those relationships and that knowledge are embodied in the individuals performing the work.

### *The Former Employees' Roles and Obligations Within the SSD*

26.     Each of the Former Employees held positions within Greystone's Special Servicing Division that placed them at the center of these operations and entrusted them with access to Greystone SSD's most sensitive information and most valuable client relationships.

27.     Defendant David King was a former CW employee before coming to Greystone where he served as a Managing Director within the SSD and played a senior role in overseeing subordinate bond underwriting and investment and managing certain key client relationships. In

7

that capacity, King had visibility into Greystone SSD's portfolio, direct responsibility for important accounts, and access to confidential information concerning clients, assets, and internal strategy. King also had access to information generated in connection with Greystone's exploration of the Proposed Transaction and, as a result, was aware of the significance of the personnel, relationships, and information that made up the SSD.

28.    Consistent with these responsibilities, King entered into a written agreement with Greystone (a "Letter Agreement") that imposed express non-solicitation and confidentiality obligations. Under the Letter Agreement, King agreed that during his employment and for a twelve-month period thereafter, he would not, directly or indirectly, contact Greystone clients with whom he had material contact for the purpose of soliciting competing business, interfere with Greystone's business relationships, or solicit Greystone employees to leave the company or accept employment elsewhere. As the Letter Agreement expressly provides, King was prohibited from "contact[ing] or communicat[ing] with … customers, clients, or investors … for the purpose of soliciting … business that competes with the Greystone Entities," from "interfer[ing] with or damag[ing] any business relationship," and from "solicit[ing] … any … employee … to … accept employment … with any person or entity other than the Greystone Entities." The remaining Former Employees entered into Letter Agreements containing substantially similar non-solicitation provisions.

29.    Through his role in the SSD, and based on his contractual obligations to maintain their secrecy, King was afforded access to a number of Greystone's trade secrets, including: (i) LoanSStar, Greystone's proprietary servicing system containing, among other things, loan and asset information, valuations, strategy recommendations, and resolution statuses; (ii) Surveillance App, Greystone's proprietary application detailing the SSD's "watchlist" and proprietary data on

performing loans; (iii) Base Case, Greystone's proprietary underwriting model; (iv) Greystone's bond valuation model and other models outside of Base Case; (v) policies and procedures that are proprietary to Greystone's business; and (vi) transaction and rating agency strategies.

30.    The remaining Former Employees—Jason Price, Mary English, and Greg Frederking—held similarly situated roles within the SSD, through which they were responsible for servicing functions, client relationships, and portfolio management activities for Greystone clients across the country.

31.    Price served as a Junior Asset Manager within the SSD, where he was responsible for the proactive management and resolution of a portfolio of distressed commercial real estate loans. In that role, Price analyzed loan performance, developed and executed servicing strategies, and engaged directly with borrowers, counterparties, and third-party professionals to drive outcomes on complex assets. His responsibilities required familiarity with client-specific portfolios, underlying loan documents, and servicing agreements, and placed him in regular contact with internal teams and external stakeholders responsible for advancing Greystone's servicing relationships.

32.     English served as an Insurance Manager within the SSD, where she managed insurance-related aspects of portfolios of specially serviced loans and ensured compliance with servicing requirements, loan documents, and investor guidelines. In that role, she worked closely with asset managers, legal teams, borrowers, and external counterparties to resolve coverage issues, support loan servicing and transfers, and advise on risk implications affecting servicing outcomes. Her responsibilities played a key role in maintaining the integrity and continuity of servicing relationships across the portfolio

33.    Frederking served as Managing Director, Portfolio Oversight within the SSD, where he was responsible for managing portfolios of specially serviced loans, overseeing surveillance and investor reporting functions, and coordinating communications with investors, master servicers, and other key stakeholders. In that capacity, Frederking had visibility into portfolio performance across assets, participated in credit decision-making, and played a leadership role in ensuring that servicing activities and client reporting complied with applicable requirements. His responsibilities placed him at the center of portfolio-level strategy, client communications (including with 400 Capital and Prime), and the ongoing management of Greystone's servicing relationships.

34.    In performing those roles, the Former Employees had access to Greystone's confidential and proprietary SSD information, including client-specific data, servicing strategies, and portfolio information, and each developed familiarity with Greystone's SSD clients and internal operations. Each entered into a Letter Agreement containing substantially similar non-solicitation provisions as King's Letter Agreement—restricting their ability to solicit Greystone clients and employees following their departure. True and correct copies of the Letter Agreements for King, Price, English, and Frederking are attached hereto as Exhibits 1-4, respectively.

35.    In addition to their contractual obligations, each of the Former Employees expressly acknowledged and agreed to comply with Greystone's employee manual (the "Employee Manual") prior to the conduct at issue in this Complaint. Through Greystone's internal acknowledgment system, each of the Former Employees confirmed receipt of the Employee Manual and agreed to be bound by its policies, including its confidentiality and data protection requirements. The Employee Manual provides that "an employee's employment with Greystone includes an obligation to maintain confidentiality, even after they leave our employ," and defines

10

"Confidential Information" to include "any data or information … that is material to Greystone's business operations and is not generally known to the public," including "trade secrets," "lists … about current and prospective clients," "plans or strategies for sales … or business development," and "prices or pricing strategy or information." The Employee Manual further makes clear that disclosure of such information may result in termination and "potential legal action." A true and correct excerpted copy of the Employee Manual is attached hereto as Exhibit 5.

36.    The confidentiality obligations imposed by the Employee Manual are independent of, and in addition to, the contractual restrictions set forth in the Letter Agreements. Together, these obligations required each Former Employee to maintain the confidentiality of Greystone's information both during and after employment and prohibited the use or disclosure of that information outside the scope of their duties for Greystone.

37.    Through their positions, the Former Employees were entrusted with the relationships, personnel knowledge, and confidential information that define the value of the SSD, and were expressly prohibited—both by contract and by Company policy—from exploiting those relationships or that information for the benefit of a competitor or from attempting to transfer Greystone's business to another firm.

### *Greystone Explores Sale of Special Servicing Assets*

38.    Beginning in 2024, Greystone undertook a strategic review of its business operations and determined to explore a potential sale of its SSD in order to focus on its core lines of business. As part of that process, Greystone engaged with prospective buyers, shared confidential business information, and evaluated potential transaction structures. Non-disclosure agreements ("NDAs") were sent to multiple potential buyers and the market knew that the SSD was for sale.

39.     King was centrally involved in that process. He was provided highly confidential information regarding Greystone's sale of the SSD business and associated strategy, participated in outreach to potential buyers, knew what information was in the data room, and, while not directly involved in negotiating, was aware of the deal terms under discussion and agreed to.

40.     CW presented itself as an interested purchaser and, accordingly, was offered the opportunity to execute a non-disclosure agreement that would permit access to diligence materials concerning the Proposed Transaction. On October 18, 2025, CW returned a copy of the non-disclosure agreement to Greystone that was modified with the "only significant change" being to "delete the non-solicitation section."  A true and correct copy of this email and attachments is attached hereto as Exhibit 6.

41.     CW's proposed change to the non-disclosure agreement omitting the non-solicitation provision was unacceptable to Greystone and the parties continued to negotiate the agreement. On October 20, 2025, CW returned a further modified draft to Greystone. In transmitting that markup, CW explained that its revisions "keep[] your non-solicit language but carve[] out special servicing employees" and stated that CW did not "want to be under" any non-solicitation obligation with respect to special-servicing personnel if "this transaction does not proceed." The resulting redline modified the proposed non-solicitation provision to provide expressly that it would "not apply to any of Greystone Group's special servicing personnel." The proposed changes to the non-solicitation provision were the only substantive revisions proposed by CW. A true and correct copy of this email and attachments is attached hereto as Exhibit 7.

42.     CW's proposed solution was, again, unacceptable to Greystone. Accordingly, the parties never executed the non-disclosure agreement, and CW was never given access to the Proposed Transaction diligence materials.

43.     Prior to entering into negotiations with the Buyer and signing the APA, Greystone first engaged with another potential buyer, but the parties did not reach agreement on certain key terms, and that deal ended for reasons unrelated to the SSD assets themselves. Thereafter, Greystone engaged with the Buyer. Because the Buyer's affiliate had previously sold the SSD business to Greystone in 2019, the Buyer was already familiar with the SSD and was excited by the prospect of repurchasing it when SSD's assets came up for sale.

44.     By late October 2025, as negotiations with Buyer had progressed, King purportedly believed he was unlikely to have a role within the Buyer's organization in the event the Proposed Transaction closed. In an October 28, 2025, email to Greystone Founder and CEO Steve Rosenberg, King acknowledged that "in all likelihood, there won't be a job for me in that new organization," and requested that Greystone release him from his contractual non-solicitation obligations in the event the transaction proceeded to a "hard contract." A true and correct copy of this email exchange between King and Rosenberg is attached hereto as Exhibit 8.

45.     Rosenberg did not grant any such release. Instead, he responded on October 30, 2025, that he was willing to discuss the issue further. *See id*. A video call between King and Rosenberg was subsequently scheduled for that purpose but, ultimately, was cancelled and never held.

46.     The timing of CW's insistence on preserving its ability to solicit SSD personnel, discussed above in paragraphs 40-42, is significant. King's email to Rosenberg seeking relief from the very non-solicitation obligations that restricted his ability to solicit Greystone employees and clients occurred just *eight days later*. Upon information and belief, King's request to Rosenberg was not made in isolation. Rather, it was made after communications and coordination with CW concerning King's future employment and CW's efforts to absorb Greystone's SSD without

paying Greystone for it. CW's contemporaneous insistence on exempting SSD personnel from the proposed NDA's non-solicitation provision reflects CW's specific interest in retaining the freedom to recruit those employees—who hold close relationships with Greystone's clients—even if the Proposed Transaction never closed.

47.    Upon information and belief, King shared the email exchange in Exhibit 8 with CW and, together, King and CW agreed to take the position that King had been released from his non-solicitation obligations, despite the fact that no reasonable person could interpret Exhibit 8 as granting any such release. Upon information and belief, CW's contemporaneous efforts to preserve its ability to recruit SSD personnel, together with King's nearly immediate request for relief from his own non-solicitation obligations, were components of a coordinated plan between King and CW to appropriate Greystone's SSD personnel and clients.

48.    On October 30, 2025, the Buyer sent Greystone a signed indication of interest to acquire the SSD for millions of dollars in cash. That indication of interest assumed, among other things, retention of key personnel and no material adverse change in the business, and contemplated extensive diligence on the special servicing portfolio, contracts, current customers and strategic partners, key personnel, and Greystone's software, systems, and intellectual property. Upon information and belief, King was aware of these terms.

49.    Shortly thereafter, on November 14, 2025, King submitted his two-week resignation notice and his employment ended on November 28, 2025. At the time of his resignation, King remained subject to his contractual non-solicitation obligations and the ongoing confidentiality obligations described above in his Letter Agreement.

### King Departs with SSD Information and Initiates Recruitment Efforts

50.    King's departure marked the beginning of a coordinated effort to recruit Greystone personnel and replicate core components of the SSD at a direct competitor.

14

51.     Immediately after his resignation became effective on November 28, 2025, King joined CW, a direct competitor in the special-servicing market.

52.     Little did Greystone know at the time, but King was not going to CW emptyhanded. Indeed, in the weeks leading up to his resignation, King had been pilfering Greystone's confidential and trade secret information by, among other means, emailing files from his Greystone email account to his personal account.

53.     On October 13, 2025, King exported and emailed to himself his Greystone email account address book, comprised of contacts at, among other things, issuers, controlling class representatives ("CCR"),[2] brokers, and Greystone customers. A true and correct copy of the email transmitting this file is attached hereto as Exhibit 9.

54.     On October 23, 2025, just five days before ever requesting a release from his non-solicitation obligations, King emailed himself a file named "List of Securitizations and CCRs.xlsx" that contained a confidential, detailed list of *all* of Greystone's SSD securitizations and the relevant CCR. A true and correct copy of the email transmitting this file is attached hereto as Exhibit 10.

55.     On November 6, 2025, King emailed himself a file named "Top_20_SS_Loans_by_Fees_10.31.2025.xlsx" that contained confidential and trade secret information regarding the SSD's top 20 loans by revenue generation assumptions, including Greystone's proposed strategy for resolving the special status of each loan. A true and correct copy of the email transmitting this file is attached hereto as Exhibit 11.

56.     On November 10, 2025, King emailed himself a file named "400CM - NI Watchlist Reporting.xlsx" that contained confidential information relating to potential special servicing deals

---

[2]     The CCR is typically the investor who holds the most subordinate or "first loss" bond tranche in a mortgage-backed security pool. Because they bear the brunt of any initial financial loss, they are granted certain decision-making power and rights—including, among other things, the selection of the special servicer.

involving a Greystone client, 400 Capital. As discussed below, 400 Capital recently provided notice it was transferring its business from Greystone to CW. A true and correct copy of the email transmitting this file is attached hereto as Exhibit 12.

57.    On November 19, 2025, King emailed himself a file named "Greystone CMBS B-Piece Presentation.New Version.pdf" that contained confidential pitch material related to an opportunity that Greystone elected not to pursue but nevertheless reveals Greystone's confidential business strategies and insights. A true and correct copy of the email transmitting this file is attached hereto as Exhibit 13.

58.    On November 21, 2025, one week before his last day of employment, King emailed himself a file named "Greystone_Bond_Portfolio.xlsx" that contained confidential and trade secret information pertaining to Greystone's *entire* owned-bond portfolio. A true and correct copy of the email transmitting this file is attached hereto as Exhibit 14.

59.    Greystone's investigation into the materials King pilfered in connection with his jump to CW remains ongoing.  At this time, Greystone has been unable to rule out whether King took any other Greystone confidential or trade secret information with him, including trade secret information contained in LoanSStar, Surveillance App, Base Case and other SSD models, and policies and procedures that are proprietary to Greystone's business and transaction and agency rating strategies.

60.    Upon information and belief, King sent these and other confidential and trade secret materials to himself in the days and weeks leading up to his resignation under the direction of and/or in coordination with CW. There is and was no basis for King to transmit these files to himself—in breach of his Letter Agreement and the Employee Manual—for any reason other than to conspire with CW and engage in unfair and unlawful competition with Greystone.

61.    What is more, within weeks of King's departure, additional Greystone personnel began to leave under circumstances that reflected something more than ordinary employee turnover.

62.    On December 12, 2025, Jason Price submitted his resignation from Greystone to accept a position at CW, effective as of December 31, 2025. Price had worked closely with King within the SSD and was familiar with Greystone's operations and client relationships. Price quickly became instrumental in outreach efforts directed at recruiting employees from Greystone.

63.    In late January and early February 2026, Price contacted Mary English and facilitated her connection to CW, after which English submitted her resignation on February 11, 2026, and departed Greystone effective February 19, 2026. Around that same time, Price and English jointly engaged in outreach to other Greystone employees in an effort to encourage their departure.

64.    For example, between February 11 and February 19, 2026, Price and English both contacted Debra Cook, a Greystone employee in the surveillance department, and encouraged her to interview with CW. Those solicitations were persistent and directed at persuading Cook to leave Greystone. Cook refused those efforts and did not pursue employment with CW.

65.    Greystone responded promptly. On February 12, 2026, Greystone issued cease-and-desist letters to both Price and CW. In its letter to Price, Greystone specifically advised that Price's outreach to Cook violated his contractual non-solicitation obligations and demanded that he "immediately cease and desist from any further … solicitation, communication, or contact with any Greystone employee." At the same time, Greystone notified CW of Price's contractual restrictions and warned that Price was "in contact with at least one of Greystone's current employees … relating to an opportunity … to work for CW," and requested that CW instruct Price

17

to cease those efforts. True and correct copies of the cease-and-desist letters to Price and CW are attached hereto as Exhibits 15 and 16, respectively.

66. Despite this notice, the recruitment campaign did not cease. During that same period, Price also reached out to Lane Harris, an asset management associate within the SSD, and encouraged him to pursue opportunities with CW. Harris ultimately declined and remained at Greystone.

67. These unsuccessful solicitations are significant. They confirm that the departures of Price, English, and later Greg Frederking were not isolated decisions, but instead formed part of a broader, targeted effort to identify and recruit SSD personnel to CW to establish a team to poach SSD's clients and customers. That effort continued even after Greystone expressly invoked Price's contractual obligations and provided notice to CW.

68. The campaign persisted into the spring of 2026. During February 2026, CW began targeting Greg Frederking, including through in-person recruitment meetings. On May 1, 2026, Frederking submitted his resignation from Greystone, his employment ended on May 15, 2026, and he began working at CW on May 18, 2026.

69. The employees targeted by these efforts were not randomly selected. Each held a position within the SSD that involved special servicing responsibilities, client-facing functions, or access to Greystone's confidential and proprietary information. The removal—or attempted removal—of these employees had the effect of transferring operational knowledge, client familiarity, and internal expertise from Greystone to CW.

70. The timing of these recruitment efforts is particularly significant in light of King's prior involvement in the Proposed Transaction. Having participated in the sale process, King understood that the value of the SSD and sale of the business to prospective buyers depended

heavily on its personnel and their relationships with Greystone's clients. The coordinated effort to recruit those same employees—coupled with continued solicitation efforts even after Greystone issued formal cease-and-desist demands—reflects a deliberate effort to appropriate the very components of the business that gave the SSD its value so that CW could solicit and engage with SSD's clients and customers.

71.     As described below, these recruitment efforts were closely intertwined with contemporaneous efforts to solicit Greystone's clients and transfer servicing business to CW, resulting in immediate and substantial harm to Greystone and to the Proposed Transaction.

### *Defendants Solicit Greystone's Clients and Divert Servicing Business*

72.     Defendants' coordinated recruitment of Greystone personnel was not an end in itself. Rather, it was a necessary precursor to the next phase of their misconduct: soliciting Greystone's clients and diverting servicing business to CW using Greystone's own confidential information. Frederking—who resigned from Greystone on May 1, 2026, departed on May 15, 2026, and joined CW on May 18, 2026—was designated as a Key Transferred Employee under the APA, reflecting that his continued employment, knowledge, and relationships were material to the value of the SSD and to consummation of the Proposed Transaction.

73.     Within days of Frederking's arrival at CW, Defendants began leveraging both Frederking's position and Greystone's proprietary information to target Greystone's clients. On May 18, 2026, King communicated with a representative of Prime and stated that "we just brought Greg [Frederking] over for the AM component and we are doing some diabolical stuff on that front." The client responded on May 19, 2026 that it was "intrigued," and the following day

19

Greystone received notice that multiple servicing assignments were being transferred to CW. A true and correct copy of this email exchange is attached hereto as Exhibit 17.[3]

74.     That effort was informed by and depended on Greystone's trade secrets. Through their prior roles at Greystone, the Former Employees possessed confidential information concerning Greystone's client relationships, including client identities and contacts, structures of servicing assignments, pricing information, economic terms, internal financial models, and strategic approaches to managing distressed assets. King contemporaneously transmitted additional non-public SSD materials to his personal email address, as noted above. These documents were not generic reference materials; they were precisely the kinds of non-public portfolio, client, pricing, and valuation materials that would enable CW to identify the most valuable SSD assets, target Greystone's clients, and compete unfairly for Greystone's business.

75.     The timing and substance of these transfers reinforce the coordinated nature of Defendants' scheme. While Greystone was pursuing the Proposed Transaction and while CW knew the SSD was being marketed for sale, King sent himself documents reflecting the composition, profitability, and structure of Greystone's SSD assets, including loan-level fee information, securitization and CCR data, and bond portfolio information. Those transmissions provided King—and, upon information and belief, CW—with a road map to the SSD's most valuable personnel, clients, and servicing assignments and support Greystone's allegation that Defendants acted to usurp those assets without paying Greystone for them.

---

[3]     Greystone came into possession of Exhibit 17 because Frederking's Greystone email account was redirected internally following his resignation and King mistakenly forwarded the email to Frederking using Frederking's Greystone email address.

76.     The immediate diversion of Prime business was not the end of Defendants' efforts. Defendants also targeted 400 Capital, and Greystone learned that 400 Capital intended to replace Greystone with CW by notice provided on or around May 29, 2026.

77.     Prime and 400 Capital were among the core client relationships and servicing assets underlying the valuation of the SSD and the closing conditions in the APA. As a result, the loss of the Prime and 400 Capital contracts has caused the failure of certain closing conditions under the APA.

78.     Defendants undertook these actions despite explicit notice that the Former Employees' conduct violated their contractual obligations. After Greystone's February 12, 2026, letters to Price and CW, Greystone issued additional cease-and-desist letters on May 27, 2026, to King, Frederking, Price, English, and CW, specifically identifying Defendants' solicitation of clients, misuse of confidential information, and the resulting harm to Greystone and the Proposed Transaction. Defendants nevertheless retained the benefits of their misconduct, including the servicing business and client relationships obtained through the use of Greystone's personnel and trade secrets. True and correct copies of the cease-and-desist letters to King, Frederking, Price, English, and CW are attached hereto as Exhibits 18-22, respectively.

79.     Through these actions, Defendants have not merely competed with Greystone; they have used Greystone's own confidential information, trade secrets, and workforce to appropriate Greystone's business and undermine a pending transaction involving the sale of that business.

### *Summary of Harm*

80.     As a direct and proximate result of Defendants' coordinated scheme, Greystone has suffered—and continues to suffer—immediate, substantial, and irreparable harm to its business, its workforce, and the pending sale of the SSD. Defendants did not merely compete; they used Greystone's own personnel, client relationships, confidential information, and trade secrets to

21

replicate and transfer core components of the SSD to a direct competitor, inflicting harm that cannot be remedied through monetary damages alone.

81.     That scheme was enabled at the outset by the misappropriation of Greystone's trade secrets and other confidential information. In the days and weeks before his departure, King transmitted to his personal email account internal files containing detailed, non-public confidential information and trade secrets regarding Greystone's portfolio, clients, fee-generating loans, and internal analyses. Those materials provided a roadmap to Greystone's most valuable assets and were used to identify, target, and rapidly divert that business to CW with a level of precision that would not have been possible absent the Defendants' theft of Greystone's trade secrets.

82.     The consequences were swift and severe. Within days of Frederking's departure and arrival at CW in May 2026, Greystone received notice that servicing assignments representing approximately 50% of Greystone's non-agency third-party portfolio were being transferred away from Greystone through the loss of core clients, including Prime and 400 Capital. These losses were not the result of ordinary competition; they were the product of targeted solicitations informed by Greystone's stolen trade secrets and confidential information and the coordinated transfer of personnel who maintained those relationships.

83.     At the same time, Defendants' recruitment campaign stripped Greystone of key personnel and threatens to destabilize SSD's operations. The employees targeted were selected because they embodied the client relationships, servicing expertise, and institutional knowledge that define the SSD's value. Their departure, together with the ongoing risk of additional attrition due to ongoing solicitation of Greystone employees, has impaired Greystone's ability to service accounts, eroded client confidence, and placed at risk the continued viability of the SSD. If this conduct continues, Greystone faces the very real prospect that the SSD will be substantially

22

diminished or effectively dismantled as a going concern, resulting in the loss of additional client relationships and the displacement of employees whose roles depend on the continued operation of that profitable niche business.

84.    These harms have directly impaired Greystone's competitive and proprietary advantages and have materially undermined the Proposed Transaction. By exploiting Greystone's trade secrets and confidential information, Defendants gave CW an artificial and unlawful head start in targeting the most valuable components of the SSD. As a result of the loss of key personnel, client relationships, and servicing assets, the Buyer has sought a substantial reduction in the purchase price. The harm is ongoing and compounding: Defendants remain in possession of Greystone's trade secrets and continue to use them to compete for Greystone's clients, creating a continuing risk of further losses—including additional client departures, further employee defections, and the continued erosion of the SSD's value—that cannot be fully remedied after the fact.

## COUNT I

**Misappropriation of Trade Secrets (against all Defendants)**

**(Defend Trade Secrets Act – 18 U.S.C. § 1831 et seq., Virginia Uniform Trade Secrets Act – Va. Code § 59.1-336 et seq., Texas Uniform Trade Secrets Act – Tex. Civ. Prac. & Rem. Code § 134A et seq., District of Columbia Uniform Trade Secrets Act – D.C. Official Code § 36-401 et seq., and New York Common Law)**

85.    Greystone restates and incorporates by reference each of the allegations set forth in paragraphs 1-84 above as if fully set forth herein.

86.    Greystone is the owner of valuable trade secrets related to products and services used in, or intended for use in, interstate or foreign commerce. Such trade secrets comprise Greystone's financial, business, scientific, technical, economic, and engineering information, including, but not limited to, compilations, program devices, formulas, designs, prototypes,

23

methods, techniques, processes, procedures, programs, and codes, both tangible and intangible, and stored, compiled, and memorialized physically, electronically, and graphically.

87.     These trade secrets include, among other things, client identities and contacts; client relationship histories; servicing structures and economic terms; pricing information and pricing strategy; LoanSStar data; watchlist and performing-loan information in the Surveillance App; Base Case model; bond valuation and other underwriting models; policies and procedures that are proprietary to Greystone's business; transaction and rating agency strategies; and discrete files transmitted by King to his personal email, including Greystone_Bond_Portfolio, Top_20_SS_Loans_by_Fees_10.31.2025, and underwriting and asset-review materials (the "Trade Secrets").

88.     The Trade Secrets are not generally known and are not readily ascertainable by proper means by others in the field. Greystone has taken reasonable measures to maintain their secrecy, including conducting business on encrypted networks, using multi-factor authentication, establishing firewalls and need-to-know access restrictions, maintaining physical-security controls, requiring employees to sign Letter Agreements and comply with the Employee Manual, and enforcing those obligations through litigation where necessary.

89.     The Trade Secrets derive independent economic value from not being generally known because they permit Greystone to manage distressed loans, price and structure servicing work, cultivate client relationships, respond to due diligence, and compete in the special-servicing market more effectively than competitors without access to that information. The Trade Secrets implicate interstate commerce because they are used in the servicing and management of commercial real estate loans and securitized assets across multiple states and in transactions involving institutional counterparties nationwide.

90.    King acquired the Trade Secrets by virtue of his employment with Greystone and subject to the terms of his Letter Agreement and the Employee Manual. King willfully acquired, disclosed, and/or used the Trade Secrets without Greystone's express or implied consent. King used improper means to acquire, disclose, and/or use the Trade Secrets by failing to abide by the Letter Agreement and Employee Manual, including by retaining and using the Trade Secrets after departure and by transmitting discrete Trade Secret files to his personal email address just before his departure. Upon information and belief, those Trade Secrets were then used in Defendants' work to identify, target, and divert Greystone's personnel, clients, and servicing assignments to CW. CW knew or should have known that the Trade Secrets were wrongfully conveyed to it or used for its benefit by King and the Former Employees and participated in using them to solicit Greystone's employees and clients and to divert business.

91.    Defendants' misappropriation of the Trade Secrets violates the Defend Trade Secrets Act, the Virginia Uniform Trade Secrets Act, the Texas Uniform Trade Secrets Act, the District of Columbia Uniform Trade Secrets Act, and New York common law.

92.    Defendants' misappropriation of the Trade Secrets has caused Greystone to suffer irreparable harm and financial losses, in an amount to be proven at trial, and such harm persists so long as Defendants possess Greystone's trade secret and confidential material and King remains actively employed by CW.

93.    Because of Defendants' conduct and deception, Greystone has the right to, and has an immediate need for, relief created by Defendants' actions to preserve its rights and protect its business and business relationships.

## COUNT II

### Breach of Contract – Letter Agreement (against King)

94. Greystone restates and incorporates by reference each of the allegations set forth in paragraphs 1-93 above as if fully set forth herein.

95. King's Letter Agreement constitutes a valid and enforceable written contract between Greystone and King.

96. Greystone has at all times performed all of its obligations under King's Letter Agreement.

97. As described above, King breached his Letter Agreement by soliciting Greystone employees, soliciting Greystone clients, interfering with Greystone's business relationships, retaining and using Greystone's confidential, proprietary, and Trade Secret information, and using that information for CW's benefit. These breaches include, without limitation, King's solicitation of the other Former Employees; King's diversion of Prime and 400 Capital from Greystone to CW; and King's transmission of Greystone's non-public SSD files—including watchlist, bond portfolio, securitization/CCR, fee, analytics, and underwriting materials—to his personal email address for use outside Greystone.

98. As a direct and proximate result of King's breaches of his Letter Agreement, Greystone suffered and continues to suffer irreparable harm and damages in an amount to be proven at trial.

## COUNT III

### Tortious Interference with Letter Agreements (against CW)

99. Greystone restates and incorporates by reference each of the allegations set forth in paragraphs 1-98 above as if fully set forth herein.

100.    The Letter Agreements constitute valid and enforceable written contracts between Greystone and each Former Employee.

101.    Greystone has at all times performed all of its obligations under the Letter Agreements.

102.    At all relevant times, CW knew of King's and each of the other Former Employee's (Price's, English's, and Frederking's) obligations under his or her Letter Agreement, including because CW was expressly notified of at least Price's obligations in the February 12, 2026, cease-and-desist letter and because CW knowingly hired employees from a direct competitor in the very business unit CW knew was for sale. CW intentionally induced the Former Employees to breach their Letter Agreements by recruiting them, coordinating their solicitation of Greystone employees and clients, encouraging their use of Greystone's confidential information and Trade Secrets, and accepting the resulting benefits.

103.    Because of CW's inducement, the Former Employees did in fact breach their Letter Agreements, and Greystone suffered irreparable harm and financial losses, in an amount to be proven at trial, which persist so long as the Former Employees and CW remain in possession of Greystone's Trade Secrets and confidential material.

## COUNT IV

### Tortious Interference with Letter Agreements (against King)

104.    Greystone restates and incorporates by reference each of the allegations set forth in paragraphs 1-103 above as if fully set forth herein.

105.    Upon information and belief, at all relevant times, King knew of each other Former Employee's (Price's, English's, and Frederking's) obligations under their respective Letter Agreements.

27

106.    King intentionally induced Price, English, and Frederking to breach their respective Letter Agreements by recruiting or assisting in the recruitment of those employees to leave Greystone for CW, by encouraging use of Greystone's confidential information and Trade Secrets, and by facilitating efforts to transfer Greystone's personnel and clients.

107.    These induced breaches caused Greystone to suffer irreparable harm and financial losses, in an amount to be proven at trial, and such harm persists so long as Price, English, Frederking, and CW remain in possession of Greystone's Trade Secrets and confidential material.

## COUNT V

### Tortious Interference with APA (against all Defendants)

108.    Greystone restates and incorporates by reference each of the allegations set forth in paragraphs 1-107 above as if fully set forth herein.

109.    The APA is a valid and enforceable contract between Greystone and the Buyer. Under the APA, the Buyer agreed to purchase, and Greystone agreed to sell, substantially all of the assets comprising the SSD and necessary to operate it, including the exclusive right to offer employment to key personnel, client relationships, servicing rights, proprietary information, and goodwill.

110.    Defendants knew of the APA and its significance. King was involved in the sale process before leaving Greystone and knew the material deal terms under discussion. CW knew the SSD was for sale, that the Buyer's indication of interest assumed retention of key personnel and no material adverse change, and that Frederking, Prime, 400 Capital, and the continuity of personnel and client relationships were central to closing.

111.    Defendants intentionally interfered with the APA by targeting and causing the departure of Frederking, a Key Transferred Employee; soliciting and diverting Prime and 400 Capital; misusing Greystone's Trade Secrets and confidential information to facilitate those

28

transfers; and otherwise undermining the value and continuity of the assets being sold. Defendants' interference caused the failure of closing conditions under the APA and caused the Buyer to seek a substantial downward renegotiation of price.

112. As a direct and proximate result, Greystone has suffered damages including diminution in deal value, increased transaction risk, impairment of the Proposed Transaction, and other damages in an amount to be proven at trial.

## COUNT VI

### Tortious Interference with Business Relationships (against all Defendants)

113. Greystone restates and incorporates by reference each of the allegations set forth in paragraphs 1-112 above as if fully set forth herein.

114. Greystone had valid business relationships and expectancies with its SSD employees, with clients including Prime and 400 Capital, and with other longstanding clients and counterparties in the special-servicing marketplace, including the Buyer in the Proposed Transaction. Defendants knew of those relationships and expectancies.

115. Defendants intentionally interfered with those relationships and expectancies through improper means, including solicitation of Greystone employees, diversion of Greystone clients, misuse and theft of Trade Secrets and confidential information, and conduct undertaken in violation of contractual, fiduciary, and statutory duties as alleged herein. As a result, Greystone lost and/or suffered impaired employee relationships, client relationships, existing servicing assignments, prospective goodwill, and the stability of the Proposed Transaction.

116. Greystone has suffered damages as a direct and proximate result of Defendants' interference, including loss of business, loss of clients, reputational harm, and damages to be proven at trial.

29

## COUNT VII

### Unfair Competition (against CW)

117.    Greystone restates and incorporates by reference each of the allegations set forth in paragraphs 1-116 above as if fully set forth herein.

118.    Under common law, competition becomes unfair when a competitor uses improper means to appropriate another's business, goodwill, or competitive advantage. As alleged above, CW knew the SSD was being marketed for sale, knew the value of the SSD resided in its personnel, client relationships, and proprietary information, and knowingly participated in a coordinated scheme to acquire those assets without paying Greystone for them.

119.    CW's conduct was unfair because it depended on improper means, including inducing breaches of the Letter Agreements, participating in the misuse of Greystone's confidential information and Trade Secrets, recruiting Greystone personnel in violation of contractual restrictions, and using those personnel and Trade Secrets to target and divert Prime, 400 Capital, and other Greystone client relationships. Those Trade Secrets included discrete non-public files that King transmitted to his personal email address—such as Greystone watchlist reports, bond portfolio and CCR data, loan-by-fee analyses, market analytics, and internal underwriting and presentation materials—which provided CW with insight into the composition, profitability, and strategic value of the SSD assets it sought to appropriate without paying for them.

120.    CW further used these improper means at a time when it knew the SSD was the subject of the Proposed Transaction and that retention of key personnel and the absence of a material adverse change in the business were integral to the value of the business and to consummation of the transaction. By using Greystone's own personnel, goodwill, and confidential information to divert business from Greystone, CW unfairly competed for and appropriated the very assets that were being sold.

121.    As a direct and proximate result of CW's unfair competition, Greystone has suffered damages in an amount to be proven at trial, including loss of clients, loss of servicing assets, reputational harm, diminution in transaction value, and other damages.

## COUNT VIII

### Violation of Va. Code. Ann. § 18.2–499, 500 (against all Defendants)

122.    Greystone restates and incorporates by reference each of the allegations set forth in paragraphs 1-121 above as if fully set forth herein.

123.    In violation of Virginia Code § 18.2-499, Defendants combined, associated, agreed, mutually undertook, and concerted together for the purpose of willfully and maliciously injuring Greystone in its trade, business, and profession.

124.    No later than late 2025, after King concluded he likely would not have a role with the Buyer and while CW knew the SSD was being marketed for sale, Defendants reached an understanding to appropriate the SSD's personnel, client relationships, and Trade Secrets for CW's benefit and to deprive Greystone of the value of those assets without paying for them. Defendants undertook this course of action intentionally, purposefully, and without lawful justification.

125.    In furtherance of this agreement, Defendants caused the Former Employees to breach their Letter Agreements, misappropriated Greystone's Trade Secrets, solicited Greystone's employees, diverted Prime and 400 Capital and other client relationships, and used Greystone's confidential information and workforce to undermine the Proposed Transaction.

126.    This conduct was specifically aimed at damaging Greystone's business. Among other things, Defendants caused Greystone to lose a Key Transferred Employee, lose Prime and 400 Capital, suffer failure of closing conditions under the APA, confront a demanded reduction in purchase price of approximately forty percent, and endure market disruption significant enough that another longstanding client left over concerns about the SSD's viability.

31

127.    This unlawful conspiracy to injure Greystone in its business has caused Greystone to suffer irreparable harm and financial losses, in an amount to be proven at trial, and such harm persists so long as Defendants remain in possession of Greystone's trade secret and confidential material. Greystone has the right to treble damages and attorney's fees.

## COUNT IX

### Breach of Fiduciary Duty (against King)

128.    Greystone restates and incorporates by reference each of the allegations set forth in paragraphs 1-127 above as if fully set forth herein.

129.    By virtue of his position within the SSD, including his access to confidential information, client relationships, and strategic business initiatives, King owed Greystone fiduciary duties, including duties of loyalty, good faith, candor, and fair dealing. Those duties required King to refrain from competing with Greystone while employed, refrain from exploiting Greystone's business opportunities for personal gain, protect Greystone's confidential information, and use Greystone's information and relationships solely for Greystone's benefit.

130.    King breached these duties by engaging in a coordinated course of conduct to benefit CW while still owing duties to Greystone, including positioning himself and other Greystone employees for post-employment roles at CW, exploiting Greystone's confidential information and Trade Secrets, leveraging Greystone's employee and client relationships, and facilitating the transfer of Greystone business to CW. King's transmission of non-public SSD files to his personal email address before or during his departure—including portfolio, fee, securitization, analytics, and underwriting materials—was itself disloyal conduct undertaken for a purpose adverse to Greystone's interests.

131.    King further breached his fiduciary duties by using Greystone's Trade Secrets and proprietary information to identify, target, and solicit Greystone's clients and employees, and by

diverting transaction value away from Greystone and to CW at a time when the SSD was being marketed for sale. These actions were disloyal, undertaken in bad faith, and directly contrary to Greystone's interests.

132.    As a direct and proximate result of these breaches of fiduciary duty, Greystone has suffered substantial harm, including loss of employees, loss of client relationships, loss of servicing business, and impairment of the Proposed Transaction.

## COUNT X

### Aiding and Abetting Breach of Fiduciary Duty (against CW)

133.    Greystone restates and incorporates by reference each of the allegations set forth in paragraphs 1-132 above as if fully set forth herein.

134.    The Former Employees owed fiduciary duties to Greystone, as described above, and breached those duties through the conduct alleged herein.

135.    CW knew of those fiduciary duties or, at a minimum, knowingly disregarded them. CW knew the SSD was being marketed for sale, knew the Former Employees were departing a direct competitor and were subject to contractual and policy-based restrictions, and by February 12, 2026, had been expressly notified of Price's obligations and his solicitation of Greystone personnel. CW thereafter continued to recruit Greystone employees, accept their confidential information, and participate in the diversion of Greystone clients and business.

136.    CW knowingly participated in and substantially assisted the Former Employees' breaches of fiduciary duty by employing them for the purpose of building an SSD platform mirroring Greystone's, coordinating with them to recruit additional Greystone personnel, using their access to Greystone's client relationships and Trade Secrets to solicit Prime and 400 Capital, and accepting the benefits of those breaches in the form of transferred servicing assignments.

137.    As a direct and proximate result of CW's knowing participation in the Former Employees' breaches of fiduciary duty, Greystone has suffered damages in an amount to be proven at trial, including loss of employees, loss of client relationships, loss of servicing business, and impairment of the Proposed Transaction.

## COUNT XI

### Conversion (against all Defendants)

138.    Greystone restates and incorporates by reference each of the allegations set forth in paragraphs 1-137 above as if fully set forth herein.

139.    Greystone owns and has the right to exclusive possession of its confidential, proprietary, and trade secret information, including the Trade Secrets described herein.

140.    Defendants improperly and without authorization acquired, retained, used, and exercised dominion and control over that property, including by retaining and using Greystone's Trade Secrets and other proprietary information for the benefit of a competing business and to the detriment of Greystone. This included, upon information and belief, King's transmission to his personal email address of Greystone files bearing titles such as Greystone_Bond_Portfolio, List of Securitizations and CCRs, Top_20_SS_Loans_by_Fees_10.31.2025, and underwriting and asset-review materials, as well as Defendants' continued possession and use of Trade Secrets after departure to solicit Greystone's clients and compete against Greystone.

141.    Defendants' conduct is inconsistent with Greystone's ownership and possessory rights and has deprived Greystone of the use, control, confidentiality, and exclusivity of its Trade Secrets and proprietary information. As a direct and proximate result of Defendants' conversion, Greystone has suffered substantial harm, including loss of business, loss of competitive advantage, and damages in an amount to be proven at trial.

## COUNT XII

### Civil Conspiracy (against all Defendants)

142.    Greystone restates and incorporates by reference each of the allegations set forth in paragraphs 1-141 above as if fully set forth herein.

143.    Defendants are two or more persons who agreed and acted together to accomplish an unlawful object and/or to accomplish a lawful object by unlawful means. Specifically, Defendants reached a meeting of the minds to appropriate Greystone's SSD assets—including employment of key employees, client relationships, and Trade Secrets—for CW's benefit and without paying Greystone for those assets.

144.    The unlawful object and unlawful means of the conspiracy included inducing breaches of the Letter Agreements, misappropriating Trade Secrets, breaching fiduciary duties, interfering with the APA, interfering with Greystone's relationships with its employees and clients, and unfairly competing with Greystone.

145.    In furtherance of that conspiracy, Defendants committed multiple overt acts, including recruiting Greystone employees for CW, soliciting Debra Cook and Lane Harris, transmitting Greystone's non-public SSD files to a personal email account, using Greystone's confidential information and Trade Secrets to target Prime and 400 Capital, diverting servicing assignments from Greystone to CW, and undermining the Proposed Transaction.

146.    As a direct and proximate result of Defendants' conspiracy, Greystone has suffered damages in an amount to be proven at trial, including loss of employees, loss of client relationships, loss of servicing business, diminution in transaction value, and other economic harm.

## COUNT XIII

### Unjust Enrichment (against King in the alternative to Count I)

147.    Greystone restates and incorporates by reference each of the allegations set forth in paragraphs 1-146 above as if fully set forth herein.

148.    In the alternative, and only to the extent King contends that his Letter Agreement is unenforceable or otherwise does not govern the conduct at issue, Greystone pleads a claim for unjust enrichment.

149.    As described above, King obtained substantial benefits through his misconduct, including by acquiring, retaining, and using Greystone's confidential information and Trade Secrets; leveraging Greystone's client relationships and goodwill; and securing employment, compensation, and business opportunities with CW based on that information and those relationships.

150.    Those benefits were obtained at Greystone's direct expense. King's use of Greystone's confidential information and Trade Secrets enabled him to identify, target, and solicit Greystone's clients, divert servicing assignments, and undermine the value of Greystone's SSD and the Proposed Transaction. In doing so, King appropriated for himself (and for CW) the economic value of assets that rightfully belonged to Greystone.

151.    King knew of the benefits he received and reasonably should have expected that he was not entitled to retain those benefits without compensating Greystone. At all relevant times, King was aware that the confidential information, Trade Secrets, client relationships, and goodwill he exploited were developed and owned by Greystone and were entrusted to him solely for use in furtherance of Greystone's business.

152.    Under these circumstances, it would be inequitable, unjust, and against good conscience to permit King to retain the benefits of their misconduct without payment to Greystone.

36

Permitting such retention would allow King to profit from his wrongful use of Greystone's confidential information, Trade Secrets, and client relationships, and to retain the value of business and opportunities diverted from Greystone.

153.    As a direct and proximate result of King's unjust enrichment, Greystone has suffered damages in an amount to be proven at trial.

## COUNT XIV

### Declaratory Judgment (against all Defendants)

154.    Greystone restates and incorporates by reference each of the allegations set forth in paragraphs 1-153 above as if fully set forth herein.

155.    An actual and justiciable controversy exists between Greystone and Defendants concerning their respective rights and obligations under applicable law and contract.

156.    Greystone contends that the Letter Agreements entered into by the Former Employees are valid, enforceable, and binding, and that no Former Employee was released from his or her non-solicitation or confidentiality obligations.

157.    Greystone further contends that Defendants have no lawful right to use or disclose Greystone's Trade Secrets or confidential information, including information obtained through the Former Employees' prior employment with Greystone, to compete with Greystone or to solicit its employees or clients.

158.    Defendants dispute these contentions and have asserted, expressly or implicitly, that their conduct—including the use of information and relationships developed at Greystone— is permissible.

159.    A judicial declaration is necessary to resolve these disputes and to determine the parties' respective rights and obligations.

160.    Accordingly, Greystone seeks a declaration that:

a.   the Letter Agreements entered into by the Former Employees are valid and enforceable, including their non-solicitation and confidentiality provisions;

b.   no Former Employee was released from those obligations;

c.   the Defendants may not use or disclose Greystone's Trade Secrets or confidential information in connection with CW's business or otherwise;

d.   CW may not use, directly or indirectly, Greystone's Trade Secrets or confidential information—including information obtained through the Former Employees—to solicit Greystone's employees or clients or to compete unfairly with Greystone; and

e.   Defendants' ongoing conduct, as alleged herein, violates Greystone's rights under applicable law and the Letter Agreements.

## PRAYER FOR RELIEF

WHEREFORE, Greystone respectfully prays for judgment in favor of Greystone and against the Defendants as follows:

I.   Granting Greystone preliminary and permanent injunctive relief:

a.   prohibiting the Defendants and anyone acting in concert with them from accessing, using, disclosing, modifying, or deleting Greystone's confidential, proprietary, and trade secret information in their possession, custody, or control for the remainder of this litigation; and

b.   prohibiting King and anyone acting in concert with him from contacting Greystone personnel or customers or accessing any Greystone information, devices, or systems.

II.   Awarding Greystone compensatory damages in an amount to be determined at trial.

III.   Enhancing any actual damages for the Defendants' willful misappropriation of Greystone's trade secrets.

IV.    Awarding treble damages as provided for in Virginia Code § 18.2-500.

V.    Awarding punitive and exemplary damages to the fullest extent permitted by law.

VI.    Awarding declaratory relief as set forth in Count XIV.

VII.    Awarding Greystone its attorneys' fees and costs.

VIII.    Awarding pre- and post-judgment interest.

IX.    Granting Greystone such other and further relief as the Court deems just and proper.


Dated: July 7, 2026                    Respectfully submitted,

                                       /s/ *Jon M. Talotta*
                                       Jon M. Talotta (VSB No. 44590)
                                       Samuel W. Yergin (VSB No. 93862)
                                       HOGAN LOVELLS CADWALADER US LLP
                                       8350 Broad Street, 17th Floor
                                       Tysons, VA 22102
                                       Tel: 703-610-6100
                                       Fax: 703-610-6200
                                       jon.talotta@hlc.com
                                       samuel.yergin@hlc.com

                                       Michael E. DeLarco (*pro hac vice* forthcoming)
                                       HOGAN LOVELLS CADWALADER US LLP
                                       390 Madison Ave.
                                       New York, NY 10017
                                       Tel: 212-918-3000
                                       Fax: 212-918-3100
                                       michael.delarco@hlc.com

                                       Andrew T. Simmons (*pro hac vice* forthcoming)
                                       HOGAN LOVELLS CADWALADER US LLP
                                       1735 Market St., Twenty-third Floor
                                       Philadelphia, PA 10017
                                       Tel: 267-675-4600
                                       Fax: 267-675-4601
                                       andrew.simmons@hlc.com

                                       *Counsel for Plaintiff Greystone Servicing Company,*
                                       *LLC*

## VERIFICATION

I, Jenna Unell, am the Senior Managing Director, Special Servicing at Greystone Servicing Company LLC ("Greystone"), the plaintiff in this action, and I am authorized to make this verification on behalf of Greystone. I have reviewed the foregoing Complaint and am familiar with its contents. The facts set forth in the Complaint are true and correct to the best of my knowledge, information, and belief, based upon my personal knowledge, my review of documents and records of Greystone, and information provided to me by other employees and agents of Greystone. As to matters alleged in the Complaint upon information and belief, I believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 7, 2026, in Irving, Texas.

Jenna Unell
Senior Managing Director, Special Servicing
Greystone Servicing Company LLC

## CERTIFICATE OF SERVICE

I certify that on July 7, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system. Due to the emergency nature of this action, a true and accurate copy of the foregoing is being served on the following via federal express (overnight) and electronic mail:

Ronald W. Taylor
Venable LLP
750 E. Pratt Street, Suite 900
Baltimore, MD 21202
RWTaylor@venable.com

/s/ *Jon M. Talotta*
Jon M. Talotta