**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | | |
|---|---|---|
| GREYSTONE SERVICING COMPANY LLC,<br><br>Plaintiff,<br><br>v.<br><br>CWCAPITAL ASSET MANAGEMENT LLC, and DAVID KING,<br><br>Defendants. | ) | Civil Action No. 1:26-cv-02014 |

**MEMORANDUM IN SUPPORT OF GREYSTONE SERVICING COMPANY LLC'S EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Andrew T. Simmons (*pro hac vice forthcoming*)
HOGAN LOVELLS CADWALADER US LLP
1735 Market St., Twenty-third Floor
Philadelphia, PA 10017
Tel: 267-675-4600
Fax: 267-675-4601
andrew.simmons@hlc.com

Jon M. Talotta (VSB No. 44590)
Samuel W. Yergin (VSB No. 93862)
HOGAN LOVELLS CADWALADER US LLP
8350 Broad Street, 17th Floor
Tysons, VA 22102
Tel: 703-610-6100
Fax: 703-610-6200
jon.talotta@hlc.com
samuel.yergin@hlc.com

Michael E. DeLarco (*pro hac vice forthcoming*)
HOGAN LOVELLS CADWALADER US LLP
390 Madison Ave.
New York, NY 10017
Tel: 212-918-3000
Fax: 212-918-3100
michael.delarco@hlc.com

*Counsel for Plaintiff Greystone Servicing Company, LLC*

## TABLE OF CONTENTS


INTRODUCTION ........ 1

FACTUAL BACKGROUND ........ 2

Special Servicing Division ........ 2

King's Connections to CW, and His Role and Obligations at the SSD ........ 3

Greystone Explores Sale of Special Servicing Assets ........ 5

King Departs with SSD Information and Initiates Recruitment Efforts ........ 6

CW and King Solicit Greystone's Clients and Divert Servicing Business ........ 9

LEGAL STANDARD ........ 11

ARGUMENT ........ 11

I. Greystone is Likely to Succeed on the Merits of Its Misappropriation of Trade Secrets, Breach of Contract, Tortious Interference, and Virginia Statutory Conspiracy Claims ........ 11

A. Greystone is Likely to Succeed on the Merits of Its Trade Secret Claims ........ 12

1. Greystone possesses protectable trade secrets ........ 13

2. Greystone has shown actual or imminent misappropriation by Defendants ........ 15

3. The interstate commerce element of the DTSA is met ........ 17

4. Greystone has shown that Defendants have used, or are in a position to use, its trade secrets ........ 18

B. Greystone is Likely to Succeed on its Breach of Contract Claim ........ 18

1. King's Letter Agreement is an enforceable contract under Virginia law ........ 18

2. King's Non-Solicitation Provisions are Enforceable ........ 20

3. King Violated the Non-Solicitation Provision of His Letter Agreement by Inducing Clients and the Former Employees to End Their Relationships with Greystone ........ 21

C. Greystone Is Likely to Succeed on its Virginia Business Conspiracy Act Claim ........ 22

D. Greystone Is Likely to Succeed on Its Tortious Interference Claims ........ 23

II. Greystone Has and Will Continue to Suffer Irreparable Harm Absent Injunctive Relief ........ 25

III. The Balance of Equities Strongly Favors Greystone ........ 26

IV. An Injunction Serves the Public Interest ........ 27

V. The Scope of Greystone's Requested Injunctive Relief is Proper ........ 28

VI. Bond ........ 28

CONCLUSION ........ 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. Aetna Cas. & Sur. Co.*,
281 S.E.2d 818 (Va. 1981)....................18

*API Tech. Servs., LLC v. Francis*,
No. 4:13-cv-142, 2013 WL 12131381 (E.D. Va. Dec. 4, 2013)....................26, 27

*Blades of Green, Inc. v. Go Green Lawn & Pest, LLC.*,
598 F. Supp. 3d 348 (D. Md. 2022)....................17

*Boon Ins. Agency, Inc. v. Lloyd*,
No. 20-CV-02980-JMC, 2020 WL 5052956 (D.S.C. Aug. 27., 2020)....................17

*Brainware, Inc. v. Mahan*,
808 F. Supp. 2d 820 (E.D. Va. 2011) ....................20

*Brillient Corp. v. RELI Grp., Inc.*,
No. 1:24-CV-1205, 2025 WL 864280 (E.D. Va. Mar. 19, 2025)....................24

*CAE Integrated, L.L.C.*, v. *Moov Techs., Inc.*
44 F.4th 257 (5th Cir. 2022) ....................18

*Cap. One Fin. Corp. v. Sykes*,
No. 3:20CV763, 2021 WL 2903241 (E.D. Va. July 9, 2021) ....................26, 27, 28

*Design & Prod., Inc. v. Am. Exhibitions, Inc.*,
820 F. Supp. 2d 727 (E.D. Va. 2011) ....................21

*Fidelity Glob. Brokerage Grp., Inc. v. Gray*,
No. 1:10CV1255, 2010 WL 4646039 (E.D. Va. Nov. 9, 2010) ....................27

*Figueroa v. Butterball, LLC*,
164 F.4th 312 (4th Cir. 2026) ....................18

*Filak v. George*,
594 S.E.2d 610 (Va. 2004)....................21

*Granny Goose Foods, Inc. v. Bhd. Of Teamsters*
** Auto Truck Drivers Local No. 70*, 415 U.S. 423 (1974)....................11

*HealthTrackRX, Inc. v. Samaha*,
No. 4:24-CV-1100-SDJ, 2025 WL 1782559 (E.D. Tex. Feb. 3, 2025)....................18

*Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*,
174 F.3d 411 (4th Cir. 1999) ....................................................................................11

*Jacob v. Steward Partners Glob. Advisory, LLC*,
No. 1:23-CV-1179-DII, 2024 WL 4752099 (W.D. Tex. Sept. 27, 2024)...............................19

*Knox Energy, LLC v. Gasco Drilling Inc.*,
738 Fed. App'x 122 (4th Cir. 2018) ........................................................................18

*Laz Karp Assocs., Inc. v. Starre*,
No. 1:25-CV-2111, 2025 WL 3562612 (E.D. Va. Dec. 12, 2025)........................14, 15, 17, 27

*Lucy v. Zehmer*,
84 S.E.2d 516 (1954) .............................................................................................18

*M Corp v. Infinitive, Inc.*,
No. 1:24-CV-1823, 2024 WL 4696132 (E.D. Va. Nov. 6, 2024) ....................................23, 26

*McNulty v. EZE Castle Integration, Inc.*,
No. 24-CV-9983 (VSB) (RFT), 2026 WL 789517 (S.D.N.Y. Jan. 28, 2026),
*report and recommendation adopted*, No. 24-CV-9983 (VSB) (RFT), 2026
WL 851335 (S.D.N.Y. Mar. 27, 2026) ........................................................................20

*MicroStrategy, Inc. v. Lauricia*,
268 F.3d 244 (4th Cir. 2001) ....................................................................................19

*Montagna v. Holiday Inns. Inc.*,
269 S.E.2d 838 (Va. 1980).........................................................................................18

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*,
915. F.3d 197, 216 (4th Cir. 2019) ............................................................................25

*NaturaLawn of Am., Inc. v. W. Grp., LLC*,
484 F. Supp. 2d 392 (D. Md. 2007)...........................................................................27

*Nortec Commc'ns, Inc. v. Lee-Llacer*,
548 F. Supp. 2d 226 (E.D. Va. 2008) .........................................................................22

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*,
290 F.3d 578 (3d Cir. 2002).......................................................................................27

*Real Truth About Obama, Inc. v. FEC*,
575 F.3d 342 (4th Cir. 2009) ....................................................................................11

*Roe v. Dep't of Def.*,
947 F.3d 207 (4th Cir. 2020), *as amended Jan. 14, 2020*.......................................................28

*Salomon & Ludwin, LLC v. Winters*,
741 F. Supp. 3d 398 (E.D. Va. 2024), *aff'd in part, vacated in part*, 150 F.4th 268 (4th Cir. 2025) ....13, 25, 26

*Sams v. Pinnacle Treatment Centers, Inc.*,
No. 118CV09610JHRAMD, 2021 WL 567986 (D.N.J. Feb. 16, 2021) ....19

*Samuel Sherbrook Corporate, Ltd. V. Mayer*,
159 F.4th 252 (4th Cir. 2025) ....12, 14, 15

*SDSE Networks, Inc. v. Mathur*,
No. 1:22-cv-1024, 2022 WL 18109791 (E.D. Va. Sept. 15, 2022) ....25

*Space Sys./Loral, LLC v. Orbital ATK, Inc.*,
306 F. Supp. 3d 845 (E.D. Va. 2018) ....12, 17

*Tactical Rehab., Inc. v. Youssef*,
No. 2:24-CV-173, 2024 WL 4712696 (E.D. Va. Nov. 7, 2024) ....18

*Thorne v. Satellogic USA, Inc.*,
No. 3:23-CV-00619, 2024 WL 1558707 (M.D. Tenn. Apr. 9, 2024)....19

*Update, Inc. v. Samilow*,
311 F. Supp. 3d 784 (E.D. Va. 2018) ....25

*Variable Annuity Life Ins. Co. v. Coreth*,
535 F. Supp. 3d 488 (E.D. Va. 2021) ....11, 27, 28

*Wellogix, Inc. v. Accenture, L.L.P.*,
716 F.3d 867 (5th Cir. 2013) ....12

**Statutes**

18 U.S.C. §§ 1831-39 ....12

18 U.S.C § 1836....12, 17

18 U.S.C. § 1839....12, 13, 15

D.C. Code Ann. § 36-401 ....12, 13, 15

Tex. Civ. Prac. & Rem. Code Ann. § 134A.002....13, 15

Tex. Civ. Prac. & Rem. Code §§ 134.001, *et seq* ....12

Va. Code Ann. § 18.2-499 ....22

Va. Code § 49.1-336 ....15

Va. Code §§ 59.1-336 *et seq.* ....................12

**Other Authorities**

Fed. R. Civ. P. 65 ....................11

Plaintiff Greystone Servicing Company LLC ("Greystone") respectfully submits this Memorandum of Law in Support of its Emergency Motion for Temporary Restraining Order ("TRO") and Preliminary Injunction against Defendants CW Capital Asset Management, LLC ("CW"), and David King.

## INTRODUCTION

This case arises from a calculated and coordinated scheme, orchestrated by CW and David King, a former Greystone senior executive subject to confidentiality and non-solicitation obligations, to plunder Greystone's Special Servicing Division ("SSD") without purchasing the business itself. Defendants' conduct is a classic example of misappropriation and unlawful conduct.

Greystone's SSD business depends on specialized personnel, longstanding client relationships, and trade secret and confidential business information, including pricing strategies, client-specific data, and proprietary servicing models. King, a senior executive within the SSD during his employment with Greystone, and CW (King's employer prior to Greystone) targeted those same assets through nefarious means. In Fall 2024, Greystone began to explore options to sell its SSD assets. King's knowledge of the proposed sale of the SSD (the "Proposed Transaction") set into motion his scheme to improperly exploit his intimate knowledge of Greystone's SSD, including his SSD coworkers, Jason Price, Greg Frederking, and Mary English (the "Former Employees"), clients, confidential information, and trade secrets to benefit his old (now current) employer, CW.

To frame Defendants' conduct, CW held itself out as a prospective purchaser of the SSD during Greystone's SSD sales process and sought to access confidential diligence material concerning the SSD. During this process, CW insisted on eliminating the non-solicitation conditions in the Proposed Transaction's non-disclosure agreement ("NDA"). Greystone refused

to accept CW's revisions. ***Within a matter of weeks***, King was not only employed at CW, but he had improperly transferred confidential and trade secret information from his Greystone email account to his personal email account and had solicited Greystone's clients and his former SSD coworkers in violation of his post-employment obligations. In the aftermath, Greystone has lost numerous clients to CW, numerous employees to CW, and King and CW are still in possession of Greystone's most sensitive business information.

As explained in the Verified Complaint (ECF No.1, hereinafter "Compl.") and below, this Court should issue a TRO and preliminary injunction enjoining Defendants from continuing to misappropriate Greystone's trade secrets and confidential information and prevent King from continuing to breach his post-employment obligations. Defendants' conduct has and will continue to cause irreparable harm to Greystone and thus, for the reasons set forth herein, Greystone is entitled to emergency injunctive relief.

## FACTUAL BACKGROUND

### *Special Servicing Division*

Greystone's Special Servicing Division is a valuable, niche component of Greystone's commercial real estate finance and loan servicing business and provides services to clients across the United States. Compl. at ¶ 23. In general terms, special servicing involves the management and resolution of distressed or non-performing commercial real estate loans, requiring ongoing, strategic oversight of complex assets experiencing financial distress, default, or restructuring. *Id.* at ¶ 24. Through these activities, Greystone's SSD manages loans and assets across large and sophisticated portfolios, involving securitized transactions and institutional investors. *Id.* at ¶ 25. This work demands detailed, asset-level knowledge, real-time judgment, and sustained engagement with counterparties whose expectations and investment objectives must be navigated carefully to preserve value. *Id*. Because of the nature of this business, the SSD is relationship-

driven and heavily dependent on the experience and judgment of personnel who cultivate client relationships, understand the history and nuances of specific assets and portfolios, and apply proprietary strategies developed through years of experience. *Id*.

***King's Connections to CW, and His Role and Obligations at the SSD***

Prior to joining Greystone, CW employed King. *Id.* at ¶ 27. At Greystone, King served as a Managing Director within the SSD and played a senior role in overseeing subordinate bond underwriting and investment and managing key client relationships. *Id*. In that capacity, King had visibility into Greystone's portfolio, direct responsibility for important accounts, access to confidential information concerning clients, assets, and internal strategy, and information generated in connection with Greystone's exploration of the Proposed Transaction. *Id.*

Consistent with these responsibilities, King entered into a written agreement ("Letter Agreement") with Greystone that imposed express non-solicitation and confidentiality obligations. *Id.* at ¶ 28. Under the Letter Agreement, King agreed that during his employment and for a twelve-month period thereafter, he would not, directly or indirectly, contact Greystone clients with whom he had material contact for the purpose of soliciting competing business, interfere with Greystone's business relationships, or solicit Greystone employees to leave the company or accept employment elsewhere. *Id*. As the Letter Agreement expressly provides, King was prohibited from "contact[ing] or communicat[ing] with … customers, clients, or investors … for the purpose of soliciting … business that competes with the Greystone Entities," from "interfer[ing] with or damag[ing] any business relationship," and from "solicit[ing] … any … employee … to … accept employment … with any person or entity other than the Greystone Entities." *Id*. The remaining Former Employees entered into Letter Agreements containing substantially similar non-solicitation provisions. *Id.*

Through his role in the SSD, and based on his contractual obligations to maintain their secrecy, King was afforded access to Greystone's trade secrets, including, for example, LoanSStar, Greystone's proprietary servicing system containing loan and asset information, valuations, strategy recommendations, and resolution statuses; Surveillance App, Greystone's proprietary application detailing the SSD's "watchlist" and proprietary data on performing loans; Base Case, Greystone's proprietary underwriting model; Greystone's bond valuation model and other models outside of Base Case; proprietary policies and procedures; and transaction and agency rating strategies. *Id.* at ¶ 29.

King also expressly acknowledged and agreed to comply with Greystone's Employee Manual. *Id.* at ¶ 35. King confirmed receipt of the Employee Manual and agreed to be bound by its policies, including its confidentiality and data protection requirements. *Id.* The Employee Manual provides that "an employee's employment with Greystone includes an obligation to maintain confidentiality, even after they leave our employ," and defines "Confidential Information" to include "any data or information … that is material to Greystone's business operations and is not generally known to the public," including "trade secrets," "lists … about current and prospective clients," "plans or strategies for sales … or business development," and "prices or pricing strategy or information." *Id.* The Employee Manual further makes clear that disclosure of such information may result in termination and "potential legal action." *Id.*

Together, the Letter Agreements and Employee Manual required King to maintain the confidentiality of Greystone's information both during and after employment and prohibited the use or disclosure of that information outside the scope of his duties for Greystone. *Id.* at ¶ 36. Through his position, King was entrusted with the relationships, personnel knowledge, and confidential information that define the value of the SSD, and was expressly prohibited—both by

contract and by Company policy—from exploiting those relationships or that information for the benefit of a competitor or from attempting to transfer Greystone's business to another firm. *Id.* at ¶ 37.[1]

***Greystone Explores Sale of Special Servicing Assets***

Beginning in 2024, Greystone undertook a strategic review of its business operations and determined to explore a potential sale of its SSD in order to focus on its core lines of business. *Id.* at ¶ 38. The marketplace knew that the SSD was for sale. *Id.* CW presented itself as an interested purchaser of the SSD, and accordingly, along with other potential buyers, was offered the opportunity to execute a non-disclosure agreement ("NDA") that would permit CW access to diligence material concerning the Proposed Transaction. *Id.* at ¶ 40. During this period, CW returned a marked-up version of the non-disclosure agreement to Greystone, wherein CW's "only significant change" was to "delete the non-solicitation section." *Id.* at 41. The resulting mark-up modified the NDA's proposed non-solicitation provision to provide expressly that it would "not apply to any of Greystone Group's special servicing personnel." *Id.*. CW's proposed changes were, naturally, unacceptable to Greystone, and CW was never given access to the Proposed Transaction diligence materials. *Id.* at 42.

King was centrally involved in the Proposed Transaction. *Id.* at ¶ 39. Greystone provided King with highly confidential information regarding Greystone's sale of the SSD business and associated strategy, participated in outreach to potential buyers, knew what information was in the

---

[1] The other Former Employees—Jason Price, Mary English, and Greg Frederking—held similarly situated roles within the SSD, through which they were responsible for servicing functions, client relationships, and portfolio management activities for Greystone clients across the country. *Id.* at ¶ 28. In performing those roles, each had access to Greystone's confidential and proprietary information, including client-specific data, and entered into Letter Agreements containing substantially similar non-solicitation provisions as King's Letter Agreement and signed acknowledgments that they would comply with the Employee Manual. *Id.* at ¶ 33.

data room, and, while not directly involved in negotiating, was aware of the deal terms under discussion and agreed to. *Id*. By late October 2025, as negotiations with a Buyer had progressed, King purportedly believed that he was unlikely to have a role within Buyer's organization in the event the Proposed Transaction closed. *Id.* at ¶ 44. In an October 28, 2025, email to Greystone Founder and CEO Steve Rosenberg, King acknowledged that "in all likelihood, there won't be a job for me in that new organization," and requested that Greystone release him from his contractual non-solicitation obligations in the event the transaction proceeded to a binding agreement. *Id*. Rosenberg did not grant any such release; instead, he responded on October 30, 2025, that he was willing to discuss the issue further. *Id*. A video call between King and Rosenberg was subsequently scheduled for that purpose but never held. *Id*.

The timing of CW's insistence on preserving its ability to solicit SSD personnel is significant. Upon information and belief, King shared the email exchange with CW and, together, King and CW agreed to take the position that King had been released from his non-solicitation obligations, despite the fact that no reasonable person could interpret the exchange as granting any such release. *Id.* at ¶ 46. Upon information and belief, CW's contemporaneous efforts to preserve its ability to recruit SSD personnel, together with King's nearly immediate request for relief from his own non-solicitation obligations, were components of a coordinated plan between King and CW to appropriate Greystone's SSD personnel and clients. *Id.* at ¶ 46-47  Shortly thereafter, on November 14, 2025, King submitted his two-week resignation notice and his employment ended on November 28, 2025. *Id.* at ¶ 49. At the time of his resignation, King remained subject to his post-employment obligations. *Id.*

***King Departs with SSD Information and Initiates Recruitment Efforts***

King's departure marked the beginning of a coordinated effort to recruit Greystone personnel and replicate core components of the SSD at a direct competitor. *Id.* at ¶ 50. Immediately

after his resignation became effective on November 28, 2025, King joined CW. *Id.* at ¶ 51. Unbeknownst to Greystone, King was not going to CW emptyhanded; in the weeks leading up to his resignation, including when CW was seeking access to the SSD diligence materials, King had been emailing files from his Greystone email account to his personal account. *Id.* at ¶ 52. This highly confidential information included:

- On October 13, 2025, King exported and emailed to himself his Greystone email account address book, comprised of contacts at, among other things, issuers, controlling class representatives, brokers, and Greystone customers. *Id.* at ¶ 53.

- On October 23, 2025, just five days before ever requesting a release from his non-solicitation obligations, King emailed himself a file named "List of Securitizations and CCRs.xlsx" that contained a confidential, detailed list of all of Greystone's SSD securitizations and the relevant CCR. *Id.* at ¶ 54.

- On November 6, 2025, King emailed himself a file named "Top_20_SS_Loans_by_Fees_10.31.2025.xlsx" that contained confidential and trade secret information regarding the SSD's top 20 loans by revenue generation assumptions, including Greystone's proposed strategy for resolving the special status of each loan. *Id.* at ¶ 55.

- On November 10, 2025, King emailed himself a file named "400CM - NI Watchlist Reporting.xlsx" that contained confidential information relating to potential special servicing deals involving one of Greystone's largest special servicing clients, 400 Capital Management, LLC ("400 Capital"). *Id.* at ¶ 56. As discussed below, 400 Capital recently provided notice it was transferring its business from Greystone to CW. *Id.*

- On November 19, 2025, King emailed himself a file named "Greystone CMBS B-Piece Presentation.New Version.pdf" that contained confidential pitch material related to an opportunity that Greystone elected not to pursue but nevertheless reveals Greystone's confidential business strategies and insights. *Id.* at ¶ 57.

- On November 21, 2025, King emailed himself a file named "Greystone_Bond_Portfolio.xlsx" that contained confidential and trade secret information pertaining to Greystone's entire bond portfolio. *Id.* at ¶ 58.

There is no legitimate basis for King to transmit these files to himself for any reason other than to conspire with CW and engage in unfair and unlawful competition with Greystone. *Id.* at ¶ 60. Greystone is unable to rule out whether King or the other Former Employees have taken any other Greystone confidential information and trade secret information at this time. *Id.* at ¶ 59.

Within weeks of King's departure, additional Greystone personnel began to leave under circumstances that reflected something more than ordinary employee turnover. *Id.* at ¶ 61. On December 12, 2025, Jason Price, who had worked closely with King within the SSD and was familiar with Greystone's client relationships, resigned from Greystone to accept a position at CW, effective as of December 31, 2025. *Id.* at ¶ 62. In late January and early February 2026, Price contacted Mary English and connected her to CW; English submitted her resignation on February 11, 2026, and departed Greystone effective February 19, 2026. *Id.* at ¶ 63. Around that same time, Price and English jointly engaged in outreach to other Greystone employees in an effort to encourage their departure, including Debra Cook and Lane Harris. *Id.* at ¶ 64-66.

Greystone responded on February 12, 2026, Greystone issued cease-and-desist letters to both Price and CW. *Id.* at ¶ 65. Despite this notice, the recruitment campaign did not cease. *Id.* at ¶ 66. The solicitations of Cook and Harris confirm that the departures of Price, English, and later Greg Frederking were part of a broader, targeted effort to identify and recruit SSD personnel to CW to establish a team to poach SSD's clients and customers. *Id.* at ¶ 67. During February 2026, CW began targeting Greg Frederking, including through in-person recruitment meetings. *Id.* at ¶ 68. On May 1, 2026, Frederking submitted his resignation from Greystone, his employment ended on May 15, 2026, and he began working at CW on May 18, 2026. *Id.*[2] The employees targeted by these efforts were not randomly selected: each held a position within the SSD that involved special servicing responsibilities, client-facing functions, or access to Greystone's confidential and proprietary information, and their removal—or attempted removal—had the effect of transferring

[2] Greystone issued additional cease-and-desist letters on May 27, 2026, to King, Frederking, Price, English, and CW, specifically identifying Defendants' solicitation of clients, misuse of confidential information, and the resulting harm to Greystone and the Proposed Transaction. *Id.* at 78.

operational knowledge, client familiarity, and internal expertise from Greystone to CW. *Id.* at ¶ 69. As described below, these recruitment efforts were closely intertwined with contemporaneous efforts to solicit Greystone's clients and transfer servicing business to CW, resulting in immediate and substantial harm to Greystone and to the Proposed Transaction. *Id.* at ¶ 71.

***CW and King Solicit Greystone's Clients and Divert Servicing Business***

Defendants' coordinated recruitment of Greystone personnel was not an end in itself, but a necessary precursor to soliciting Greystone's clients and diverting servicing business to CW using Greystone's own confidential information. *Id.* at ¶ 72. Frederking—who resigned from Greystone on May 1, 2026, departed on May 15, 2026, and joined CW on May 18, 2026—was designated as a Key Transferred Employee in the Proposed Transaction, reflecting that his continued employment, knowledge, and relationships were material to the value of the SSD and to consummation of the Proposed Transaction. *Id.*

Within days of Frederking's arrival at CW, Defendants began leveraging both Frederking's position and Greystone's proprietary information to target Greystone's clients. *Id.* at ¶ 73. On May 18, 2026, King communicated with a representative of Prime Finance Advisor, L.P. ("Prime"), one of Greystone's largest special servicing clients, and stated that "we just brought Greg [Frederking] over for the AM component and we are doing some diabolical stuff on that front." *Id.* The client responded on May 19, 2026, that it was "intrigued," and the following day Greystone received notice that multiple Prime servicing assignments were being transferred to CW. *Id.*

That effort was informed by and depended on Greystone's trade secrets. *Id.* at ¶ 74. Through their prior roles at Greystone, the Former Employees possessed confidential information concerning Greystone's client relationships, including client identities and contacts, structures of servicing assignments, pricing information, economic terms, internal financial models, and strategic approaches to managing distressed assets. *Id.* King contemporaneously transmitted

additional non-public SSD materials to his personal email address, as noted above—precisely the kinds of non-public portfolio, client, pricing, and valuation materials that would enable CW to identify the most valuable SSD assets, target Greystone's clients, and compete unfairly for Greystone's business. *Id.*

The timing and substance of these transfers reinforce the coordinated nature of Defendants' scheme. *Id.* at ¶ 75. While Greystone was pursuing the Proposed Transaction and while CW knew the SSD was being marketed for sale (indeed, it feigned interest in purchasing the SSD), King sent himself documents reflecting the composition, profitability, and structure of Greystone's SSD assets, including loan-level fee information, securitization and CCR data, and bond portfolio information. *Id.* Those transmissions provided King—and, upon information and belief, CW—with a road map to the SSD's most valuable personnel, clients, and servicing assignments and support Greystone's allegation that Defendants acted to usurp those assets without paying Greystone for them. *Id.*

The immediate diversion of Prime business upon Frederking's arrival at CW was not the end of Defendants' efforts. *Id.* at ¶ 76. Defendants also targeted 400 Capital, and Greystone learned that 400 Capital intended to replace Greystone with CW by notice provided on or around May 29, 2026. *Id.* Prime and 400 Capital were among the core client relationships and servicing assets underlying the valuation of the SSD and the closing conditions in the Proposed Transaction's asset purchase agreement ("APA"), and the loss of those contracts has caused the failure of certain closing conditions under the APA. *Id.* at ¶ 77. Defendants undertook these actions despite explicit notice that King's conduct violated his contractual obligations. *Id.* at ¶ 78. Defendants have not merely competed with Greystone; they have used Greystone's own confidential information, trade

secrets, and workforce to appropriate Greystone's business and undermine the Proposed Transaction. *Id.* at 79.

## LEGAL STANDARD

To obtain a preliminary injunction, a plaintiff must show (1) a likelihood of success on the merits of its claim; (2) a likelihood of irreparable harm in the absence of the requested preliminary relief; (3) that the balance of equities favors the plaintiff; and (4) that an injunction is in the public interest. *See Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 346-47 (4th Cir. 2009). "The standard for granting either a TRO or a preliminary injunction is the same." *Variable Annuity Life Ins. Co. v. Coreth*, 535 F. Supp. 3d 488, 501 (E.D. Va. 2021); Fed. R. Civ. P. 65. "Finding a likelihood of success on only one claim is sufficient to justify injunctive relief." *Variable Annuity Life Ins. Co.*, 535 F. Supp. 3d at 494 n.3. A temporary restraining order is "intended to preserve the status quo" and prevent irreparable harm. *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 422 (4th Cir. 1999) (citing *Granny Goose Foods, Inc. v. Bhd. Of Teamsters * Auto Truck Drivers Local No. 70*, 415 U.S. 423, 439 (1974).

## ARGUMENT

### I. Greystone is Likely to Succeed on the Merits of Its Misappropriation of Trade Secrets, Breach of Contract, Tortious Interference, and Virginia Statutory Conspiracy Claims.

Greystone asserts nine (9) claims in its Complaint against Defendants but seeks only emergency relief as to Counts I (Misappropriation of Trade Secrets) , II (Breach of Contract – Letter Agreement), Counts III-VI (Tortious Interference Claims), and Count VIII (Violation of Va. Code Ann. §18.2-499,500). Greystone has established a likelihood of success on the merits of each of these claims, and, as explained below, the breach of contract claims alone are sufficient to warrant the requested relief.

### A. Greystone is Likely to Succeed on the Merits of Its Trade Secret Claims.

Greystone brings its trade secret misappropriation claims under the Defendant Trade Secrets Act ("DTSA") (18 U.S.C. §§ 1831-39), the Virginia Uniform Trade Secrets Act ("VUTSA") (Va. Code §§ 59.1-336 *et seq.*), the Texas Uniform Trade Act ("TUTSA") (Tex. Civ. Prac. & Rem. Code §§ 134.001, *et seq.*), District of Columbia Uniform Trade Secrets Act ("D.C.UTSA") (D.C. Official Code §§ 36-401 *et seq*.).

"To state a viable DTSA claim, a plaintiff must show that (1) it owns a trade secret, (2) the trade secret was misappropriated, and (3) the trade secret implicates interstate commerce." *Samuel Sherbrook Corporate, Ltd. V. Mayer*, 159 F.4th 252, 256 (4th Cir. 2025); *Space Sys./Loral, LLC v. Orbital ATK, Inc.*, 306 F. Supp. 3d 845, 853 (E.D. Va. 2018); 18 U.S.C. § 1836(b)(2)(A)(ii)(IV). To state a claim under the VUTSA, a plaintiff must show that (1) it owns a trade secret and (2) that the trade secret was misappropriated by the defendant. *Space Sys./Loral, LLC*, 306 F. Supp. 3d at 855. To establish a claim under the TUTSA, a plaintiff must show: "(a) a trade secret existed; (b) the trade secret was acquired through a breach of a confidential relationship or discovered by improper means; and (c) use of the trade secret without authorization from the plaintiff." *Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 874 (5th Cir. 2013).

The DTSA defines "trade secret" as

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if [that (1)] the owner thereof has taken reasonable measures to keep [] secret; and [(2)] the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1839(3).

"The VUTSA's definitions of trade secrets, misappropriation, and improper means are nearly identical to those definitions in the DTSA." *Salomon & Ludwin, LLC v. Winters*, 741 F. Supp. 3d 398, 404 (E.D. Va. 2024), *aff'd in part, vacated in part*, 150 F.4th 268 (4th Cir. 2025). The TUTSA's definition of "trade secret" closely mirrors the DTSA's except that it adds "list of actual or potential customers or suppliers." *Compare* Tex. Civ. Prac. & Rem. Code § 134A.002(6) *with* 18 U.S.C. § 1839(3). Likewise, the D.C.UTSA's definitions of "trade secret" and "misappropriation" are nearly identical to the definitions in the DTSA. *Compare* D.C. Code Ann. § 36-401 *with* 18 U.S.C. § 1839.

Greystone can meet the elements of each of these statutes.

***1. Greystone possesses protectable trade secrets.***

Greystone's trade secrets include, among other things, client lists and key contacts, such as those King emailed to his personal Gmail account on October 13, 2025; confidential loan information such as revenue generation assumptions and resolution strategies, contained in files like the spreadsheet King emailed to his personal Gmail account on November 6, 2025; information relating to potential special servicing deals involving Greystone's clients, contained in files such as the spreadsheet King emailed to his personal Gmail account on November 10, 2025; and, confidential business strategies and insights for potential deals, contained within files such as the .pdf King emailed to his personal Gmail account on November 19, 2025; and, confidential financial information reflecting Greystone's entire bond portfolio, contained within spreadsheets such as the one King emailed to his personal Gmail account on November 21, 2025, after he has submitted his notice resignation. Compl. at ¶¶ 53-58. Greystone's trade secrets are not generally known and are not readily ascertainable by proper means by others in its field. *Id.* at ¶

88. Greystone's trade secrets provide independent economic value from not being generally known because they permit Greystone to manage distressed loans, price and structure servicing work, cultivate client relationships, and offer a competitive advantage in the structure servicing industry. *Id.* at ¶ 89. Trade secret law protects this type of information. *Laz Karp Assocs., Inc. v. Starre*, No. 1:25-CV-2111 (RDA/WBP), 2025 WL 3562612, at *7 (E.D. Va. Dec. 12, 2025) ("Here, the alleged trade secrets include highly sensitive cost information for over fifty services, regional financial results and budget comparison, new and prospective clients with estimated revenues for each, and a lease agreement. Courts routinely find that such information derives economic value from secrecy.")

Greystone takes reasonable measures, indeed, it takes significant measures, to protect its trade secrets from disclosure. *Id.* at ¶ 88. Greystone conducts its business on encrypted networks and protects its network through multi-factor authentication. *Id.* Greystone establishes firewalls and "need-to-know" access restrictions between different practices. *Id.* Finally, Greystone protects its trade secrets through the use of the Letter Agreements and its Employee Manual, and if those fail, through litigating enforcement of the same. *Id.* The Fourth Circuit has recently held that at the pleading stage, the existence of a confidentiality provision alone is sufficient to demonstrate that a company took reasonable efforts to maintain the secrecy of its trade secrets. *See Samuel Sherbrook Corp., Ltd.*, 159 F.4th at 257. Here, however, Greystone has shown that it takes substantial measures to protect its confidential information and trade secrets from disclosure. *See Laz Karp Assocs., Inc.*, 2025 WL 3562612, at *7 ("Plaintiff took reasonable steps to preserve the secrecy of its information, including sharing only on a need-to-know basis and using password protected files, confidentiality agreements, and proprietary information policies.")

### 2. *Greystone has shown actual or imminent misappropriation by Defendants.*

Defendants have wrongfully misappropriating Greystone's confidential information and trade secrets. The DTSA defines "misappropriation" the include:

> **(A)** acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> **(B)** disclosure or use of a trade secret of another without express or implied consent by a person who--
>
> > **(i)** used improper means to acquire knowledge of the trade secret;
> >
> > **(ii)** at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was--
> >
> > > **(I)** derived from or through a person who had used improper means to acquire the trade secret;
> > >
> > > **(II)** acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or
> > >
> > > **(III)** derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret[.]

18 U.S.C. 1839(5); *Samuel Sherbrook Corp., Ltd.*, 149 F.4th at 258 (quoting 18 U.S.C. § 1839(5)); *see also* D.C. Code Ann. § 36-401(2); Va. Code § 49.1-336; Tex. Civ. Prac. & Rem. Code Ann. § 134A.002(3). The term improper "includes theft, bribery, misrepresentation, breach or induce of a breach of a duty to maintain secrecy, or espionage through electronic or other means." *Laz Karp Assocs., Inc.*, 2025 WL 3562612, at *7 (collecting cases) ("Defendant forwarded herself emails containing trade secrets before and after she was terminated. Courts in the Fourth Circuit have routinely held that a former employee sending trade secrets to his or her personal devices in similar circumstances constitutes actual or threatened misappropriation under the DTSA").

Here, Defendants have misappropriated Greystone's trade secrets by employing artifice and dishonesty to use King's first-hand knowledge of Greystone's trade secrets, including its client relationships, client identities and contacts, the structure of servicing assignments, pricing information, economic terms, proprietary policies and procedures, internal financial models, and strategic approaches to managing distressed assets to divert Greystone clients to CW. *Id.* at ¶ 74. King understood his obligations with respect to the confidentiality of Greystone's trade secrets because he executed the Letter Agreement and acknowledged that he had received and accepted the Greystone Employee Manual, which contains confidential material and IP provisions. *Id.* at ¶ 34. Despite his intimate knowledge of Greystone's trade secrets and his understanding of his obligations to safeguard the same, King utilized his knowledge of Greystone's trade secrets—including client-specific intelligence and pricing considerations—to identify, solicit, and secure the transfer of Greystone's servicing business to CW. *Id.* at ¶ 8. Upon information and belief, CW knew or had reason to know that King misappropriated Greystone's trade secrets by improper means due to the rapid migration of multiple Greystone clients to CW in the months after it hired King and the Former Employees. *Id.* at ¶ 81. CW has continued to misappropriate Greystone's trade secrets despite being put on notice by Greystone's February and May cease and desist letters. *Id.* at ¶ 78.

As set forth above, on at least six (6) occasions (that Greystone knows about), King emailed Greystone's confidential and trade secret information to his personal Gmail account. King even emailed confidential and trade secret information to his personal Gmail account *after* he had tendered his notice of resignation to Greystone. *Id.* at ¶¶ 53-58. The trade secret information King emailed to his personal Gmail account included information relating to Greystone's *entire* bond portfolio, pitch material that reflects Greystone's confidential business strategy, loan revenue

assumptions and proposed resolution strategies, client lists and contacts, and information relating to potential special servicing deals for Greystone's clients. *Id.* Courts are unequivocal that emailing trade secrets to a personal email account in the days before and after an employee resigns constitutes "improper means" under the misappropriation analysis. *See Laz Karp Assocs., Inc.*, 2025 WL 3562612, at *7. Thus, Greystone has shown actual or imminent misappropriation of its trade secrets by Defendants.

### ***3. The interstate commerce element of the DTSA is met.***

Greystone has shown that its trade secrets are "related to a product or service used in, or intended for us in, interstate or foreign commerce." 18 U.S.C § 1836(b)(1). King performed work from Virginia, and the Former Employees performed work from Texas, where CW maintains substantial operations. *Id.* at ¶¶ 16-17. King and the Former Employees were responsible for servicing functions, client relationships, and portfolio management activities for Greystone clients across the United States. *Id.* at ¶ 23. Defendants' ability to misappropriate Greystone's trade secrets relating to clients in multiple states is sufficient to establish a nexus with interstate commerce under the DTSA. *See Space Sys./Loral, LLC,* 306 F. Supp. 3d at 854 (finding interstate commerce prong satisfied where the trade secret involved business plans, procurement strategies and subcontractor and vendor relationships); *Blades of Green, Inc. v. Go Green Lawn & Pest, LLC.*, 598 F. Supp. 3d 348, 355 (D. Md. 2022) (holding that where trade secrets are used to service out-of-state customers the trade secrets "relate to interstate commerce"); *Boon Ins. Agency, Inc. v. Lloyd*, No. 20-CV-02980-JMC, 2020 WL 5052956, at *5 (D.S.C. Aug. 27., 2020) (ability to make use of trade secrets in multiple states sufficient to establish likelihood of success on interstate commerce element).

#### 4. *Greystone has shown that Defendants have used, or are in a position to use, its trade secrets.*

Finally, Greystone has sufficiently alleged that Defendants have used or are in a position to use its trade secrets. Under the TUTSA, "[a]t the TRO and preliminary-injunction stage it is not necessary for the plaintiff to satisfy the use prong. Rather, the plaintiff need only show that the defendant is 'in a position to use' trade secrets." *HealthTrackRX, Inc. v. Samaha*, No. 4:24-CV-1100-SDJ, 2025 WL 1782559, at *4 (E.D. Tex. Feb. 3, 2025) (quoting *CAE Integrated, L.L.C.*, v. *Moov Techs., Inc.* 44 F.4th 257, 263 n.19 (5th Cir. 2022)). As set forth above, Greystone has alleged that Defendants are in a position to use or to continue to use its trade secrets—including client-specific intelligence and pricing considerations—to identify, solicit, and secure the transfer of Greystone's servicing business to CW. Thus, Greystone's allegations relating to Defendants' "threatened or potential use of the trade secret alone is sufficient for injunctive relief." *Id.*

### B. Greystone is Likely to Succeed on its Breach of Contract Claim

#### 1. *King's Letter Agreement is an enforceable contract under Virginia law.*

The confidentiality and non-solicitation provisions in King's Letter Agreement are enforceable under Virginia law. Under Virginia law, a legally enforceable obligation requires "acceptance of an offer … as well as valuable consideration." *Tactical Rehab., Inc. v. Youssef*, No. 2:24-CV-173, 2024 WL 4712696, at *7 (E.D. Va. Nov. 7, 2024) (quoting *Montagna v. Holiday Inns. Inc.*, 269 S.E.2d 838 (Va. 1980)). "For a contract to be enforceable, 'there must be mutual assent of the contracting parties in terms reasonably certain under the circumstances.'" *Id.* (quoting *Allen v. Aetna Cas. & Sur. Co.*, 281 S.E.2d 818, 820 (Va. 1981)). Mutual assent "is measured *objectively,* whereby 'the law imputes to a person an intention corresponding to the reasonable meaning of his words and acts. If his words and acts, judged by a reasonable standard, manifest an intention to agree, it is immaterial what may be the real but unexpressed state of mind.'" *Knox*

*Energy, LLC v. Gasco Drilling Inc.*, 738 Fed. App'x 122, 124 (4th Cir. 2018) (emphasis in original) (quoting *Lucy v. Zehmer*, 84 S.E.2d 516, 522 (1954)).

As a general principle, the Fourth Circuit has recognized that "[a] signed offer letter is a sure sign of agreement between an employer and employee on terms of employment." *Figueroa v. Butterball, LLC*, 164 F.4th 312, 320 (4th Cir. 2026). King's Letter Agreement contains key terms of his employment, including his agreement to be bound by the confidentiality and non-solicitation provisions contained therein. *Id.* at ¶ 28. To the extent that King takes the position that the language—"[a]ll hiring and employment at Greystone is at will. I understand this offer of employment is not an employment contract"—in the Letter Agreement forecloses enforcement of the Letter Agreement's other provisions, the preponderance of legal authority to have considered the issue dispels his argument. Where, as here, the disclaimer is located within a provision of the agreement addressing "at-will" employment, the Fourth Circuit and courts around the country find that it merely establishes an "at-will" contract and does not invalidate the other terms and conditions of employment to which the parties agreed. *See, e.g., MicroStrategy, Inc. v. Lauricia*, 268 F.3d 244, 248 (4th Cir. 2001) (holding that an at-will disclaimer in an Employee Acknowledgment Form and Agreement to Arbitrate, that included language that it was "not a contract of employment", when read in context with other terms of agreement, did not invalidate arbitration provision contained within the same agreement); *Sams v. Pinnacle Treatment Centers, Inc.*, No. 118CV09610JHRAMD, 2021 WL 567986, at *5 (D.N.J. Feb. 16, 2021) ("This Court and courts elsewhere have previously held that similar disclaimer language located in an 'employment at will' section of an employment contract applies only to an employee's status as an at-will employee, and not to other terms and conditions of employment."); *Thorne v. Satellogic USA, Inc.*, No. 3:23-CV-00619, 2024 WL 1558707, at *12 (M.D. Tenn. Apr. 9, 2024) ("[T]he Offer Letter

states that it ‘does not constitute an *employment* contract,’ rather than stating more broadly that it does not constitute ‘a contract.’”); *Jacob v. Steward Partners Glob. Advisory, LLC*, No. 1:23-CV-1179-DII, 2024 WL 4752099, at *6 (W.D. Tex. Sept. 27, 2024) (“[T]he Bonus Agreement's “at -will” employment clause, stating that the agreement is “not an employment contract or an agreement … cannot be read to invalidate the agreement’s arbitration clause.”); *McNulty v. EZE Castle Integration, Inc.*, No. 24-CV-9983 (VSB) (RFT), 2026 WL 789517, at *7 (S.D.N.Y. Jan. 28, 2026), *report and recommendation adopted*, No. 24-CV-9983 (VSB) (RFT), 2026 WL 851335 (S.D.N.Y. Mar. 27, 2026) (“The disclaimers in the Offer Letter … were situated within discussions of at-will employment and could be interpreted as specifying that the employment being offered was at-will employment; in each of those cases, this Court found that the offer letters constituted enforceable contracts for at-will employment.”). Accordingly, King’s Letter Agreement constitutes a valid and enforceable at-will employment contract under Virginia law.

### ***2. King’s Non-Solicitation Provisions are Enforceable.***

King’s Letter Agreement’s non-solicitation provisions are likewise valid and enforceable. Under Virginia law, a non-solicitation provision is enforceable if it “[1] is no greater than necessary to protect the employer’s legitimate business interests, [2] is not unduly burdensome on the employee’s ability to earn a living, and [3] does not offend sound public policy.” *Brainware, Inc. v. Mahan*, 808 F. Supp. 2d 820, 825 (E.D. Va. 2011). Virginia courts routinely enforce non-solicitation provisions “where, as here, a former employee had direct customer contact or substantial knowledge of the employer’s confidential information or methods of operations” and limit the restrictive covenant period to twelve months. *Id.* at 828 (internal citation omitted). Furthermore, a “one-year time limit is not unreasonable.” *Id.*

Here, the non-solicitation provision of King's Letter Agreement is an enforceable covenant. By signing his Letter Agreement, King agreed to be bound by its terms. Further, the non-solicitation provision is narrowly tailored to restrict King for a period of twelve (12) months immediately following his employment with Greystone from soliciting Greystone's clients with whom he had material contact during his employment, and from soliciting Greystone's employees. *Id.* at ¶ 28. King acknowledged through his actions that his Letter Agreement non-solicitation obligations constituted a binding contract because he not only signed the Letter Agreement, he specifically asked for a release from his non-solicit covenants from Greystone's CEO during the Proposed Transaction. *Id.* at ¶ 44. Because the Letter Agreement contains valid contractual obligations, and because the non-solicit restrictions are no greater than necessary to protect Greystone's legitimate interests, the non-solicitation provision is enforceable under Virginia law.

#### ***3. King Violated the Non-Solicitation Provision of His Letter Agreement by Inducing Clients and the Former Employees to End Their Relationships with Greystone.***

To prove breach of contract under Virginia law, a plaintiff must show that the defendant owes a legally enforceable obligation to the plaintiff; that the defendant has breached that obligation; and that the plaintiff has suffered damages as a result of the breach. *Design & Prod., Inc. v. Am. Exhibitions, Inc.*, 820 F. Supp. 2d 727, 736 (E.D. Va. 2011) (citing *Filak v. George*, 594 S.E.2d 610, 614 (Va. 2004)). Greystone is likely to succeed on the merits of its breach of contract claim.

Greystone has established that King materially breached the non-solicitation provisions of his Letter Agreement by soliciting the Former Employees to work at CW. Merely two weeks following King's departure to CW on November 28, 2025, Defendant Price, whom King had worked closely with within the SSD, submitted his resignation and started working at CW. *Id.* at ¶

62. In late January and early February 2026, Price solicited Defendant English to resign her employment with Greystone and join CW. *Id.* at ¶ 63. Between February 11 and February 19, 2026, both Price and English contacted Greystone employees regarding employment at CW. *Id.* at ¶ 64. Similarly, Frederking started work at CW on May 18, 2026. *Id.* at ¶ 68. King was brazen regarding his solicitation of Greystone's employees, even communicating with a Greystone client representative on May 18, 2026, "we just brought Greg [Frederking] over for the AM component and we are doing some diabolical stuff on that front." *Id.* at ¶ 73.

Moreover, there is no doubt that King used Greystone's confidential information and trade secrets to solicit Greystone clients, thereby violating the confidentiality and non-solicitation provisions of his Letter Agreement. As set forth above, on May 19, 2026, merely one day after Frederking started work at CW, a Greystone client mistakenly responded to King's Greystone email account that it was "intrigued." *Id.* The very next day, the same client transferred multiple servicing assignments to CW. *Id.* Accordingly, Greystone is likely to succeed on its Breach of Contract Claim because King has repeatedly and wilfully violated the non-solicitation provisions of his Letter Agreement by soliciting clients to end or alter their relationships with Greystone, or soliciting employees to do the same, or both.

**C. Greystone Is Likely to Succeed on its Virginia Business Conspiracy Act Claim**

Greystone is entitled to injunctive relief on its Virginia Business Conspiracy Act claim. Under Virginia law, it is unlawful for any two or more persons to "combine, associate, agree, mutually undertake or concert together for the purpose of (i) willfully and maliciously injuring another in his reputation, trade, business or profession by any means whatever." Va. Code Ann. § 18.2-499. "Code § 18.2-400 does not require a plaintiff to prove that a conspirator's primary and overriding purpose is to injure another in his trade or business." *Nortec Commc'ns, Inc. v. Lee-Llacer*, 548 F. Supp. 2d 226, 233 (E.D. Va. 2008) (finding the plaintiff stated

a statutory conspiracy claim where the former employee was alleged to have solicited former employees to the plaintiff's employ and used the plaintiff's work product to provide services to clients of his new employer).

Here, Greystone has established that Defendants conspired for the purpose of willfully and maliciously injuring Greystone's business. King, armed with his knowledge that the SSD was being marketed for sale, reached an understanding and agreement to appropriate Greystone's SSD personnel, client relationships, and trade secrets for CW's benefit and to Greystone's detriment. CW presented itself as a purchaser of the SSD to gain access to confidential diligence materials, and when that failed, coordinated with King to absorb Greystone's SSD without paying for it. *Id.* at ¶ 46. Among other harm, Defendant caused Greystone to lose a Key Transferred Employee, multiple clients, and suffer failure of closing conditions under the Proposed Transaction. *Id.* at ¶ 12. Defendants' unlawful conspiracy to injure Greystone has caused and will continue to cause Greystone irreparable harm and financial losses that will continue to accrue unless its unlawful conduct is enjoined.

### D. Greystone Is Likely to Succeed on Its Tortious Interference Claims

Greystone is entitled to injunctive relief on its tortious interference claims. To prevail on its tortious interference with business expectancies claims, Greystone must establish: "(1) the existence of a business relationship or expectancy, with a probability of future economic benefit to plaintiff; (2) defendant's knowledge of the relationship or expectancy; (3) a reasonable certainty that absent defendant's intentional misconduct, plaintiff would have continued in the relationship or realized the expectancy; and (4) damage to plaintiff." *M Corp v. Infinitive, Inc.,* No. 1:24-CV-1823 (RDA/IDD), 2024 WL 4696132, at *6 (E.D. Va. Nov. 6, 2024) (granting injunctive relief based on the defendant's use of confidential information obtained during his employment to interfere with the plaintiff's business relationships). To prevail on its tortious interference with

contract claim, Greystone must demonstrate: "(1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of that contractual relationship or business expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted." *Brillient Corp. v. RELI Grp., Inc.*, No. 1:24-CV-1205 (RDA/WBP), 2025 WL 864280, at *5 (E.D. Va. Mar. 19, 2025) (plaintiff stated claim for tortious interference with non-solicitation agreements where the defendant hired multiple of the plaintiff's employees who were subject to non-solicitation agreements to perform the same work).

Here, Greystone has established a likelihood that it will prevail on its tortious interference with business relationships and expectancies claims. First, Greystone has shown that it had legitimate business relationships or expectancies with its clients and the Proposed Transaction. *Id.* at ¶ 12. Second, Defendants had knowledge of those relationships because King worked directly with the Greystone clients that departed to CW and was involved with the Proposed Transaction. King used improper means to interfere with Greystone's business relationships by directly soliciting Greystone's employees and clients using confidential information and trade secrets and using that information to undercut the Proposed Transaction. *Id.* at ¶ 111. CW likewise knowingly utilized Greystone's trade secrets to divert business from Greystone. *Id.* Defendants' conduct has caused damage to Greystone in the form of lost clients and goodwill and the substantial devaluation of the Proposed Transaction. Thus, Greystone has established that it has a significant likelihood on his tortious interference with business relationships and expectancies claims.

Likewise, Greystone has shown that King tortiously interfered with its contractual relations; namely, the Letter Agreements of the Former Employees. King intentionally induced Former Employees to breach their respective Letter Agreements by recruiting or assisting in the

recruitment of Greystone's employees to CW and to use Greystone's confidential information and trade secrets to solicit Greystone's clients. *Id.* at ¶ 106. Greystone has suffered and will continue to suffer irreparable harm so long as the Former Employees and Defendants remain in possession of Greystone's trade secrets and confidential information.

## II. Greystone Has and Will Continue to Suffer Irreparable Harm Absent Injunctive Relief

Greystone is likely to suffer irreparable harm if emergency and preliminary injunctive relief is not granted. Irreparable harm is suffered where monetary damages are difficult or impossible to ascertain or inadequate to redress the injury suffered by the plaintiff. *See Update, Inc. v. Samilow*, 311 F. Supp. 3d 784, 795 (E.D. Va. 2018). The plaintiff "must make a clear showing that it will suffer harm that is neither remote nor speculative." *Salomon & Ludwin, LLC*, 741 F. Supp. 3d at 507 (quoting *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915. F.3d 197, 216 (4th Cir. 2019)). As this Court has acknowledged, the theft and misappropriation of trade secrets constitutes irreparable harm because "a trade secret, once lost is, of course, lost forever." *SDSE Networks, Inc. v. Mathur*, No. 1:22-cv-1024, 2022 WL 18109791, at *2 (E.D. Va. Sept. 15, 2022) (internal citation omitted).

Here, Greystone has suffered and is likely to continue to suffer irreparable harm if emergency and preliminary injunctive relief is not granted. The irreparable harm facing Greystone is straightforward: Defendants continued misappropriation of Greystone's confidential information and trade secrets, which Defendants are using to solicit Greystone clients and interfere with its business and contracts, as well as King's continued breach of his post-employment non-solicitation obligations, places Greystone at risk of the imminent loss of its clients, trade secrets and commercially competitive advantage via disclosure to CW. The irreparable harm is neither remote nor speculative; indeed, Greystone has already suffered the loss of clients to CW due to

Defendants' misappropriation of Greystone's trade secrets and the breaches of the King's post-employment obligations. Greystone is likely to continue to see an exodus of its clients to CW if emergency and preliminary injunctive relief is not granted. This Court and the Fourth Circuit regularly recognizes that the unauthorized use of confidential client information to successfully solicit former clients constitutes irreparable harm. *See Salomon & Ludwin, LLC*, 150 F.4th at 278 n.7 ("[T]he Fourth Circuit has repeatedly recognized that the threat of a permanent loss of customer and the potential loss of goodwill also support a finding of irreparable harm."); *M Corp v. Infinitive, Inc.*, 2024 WL 4696132, at *7 (Similarly, courts in this District have held that "the likelihood of irreparable harm in customer solicitation cases ... is obvious" because " '[c]ustomers cannot be 'unsolicited.' "). Greystone has therefore clearly shown that it will suffer (and has suffered) irreparable harm and that an injunction is warranted to preserve the status quo and to prevent Defendants' continued use or disclosure of Greystone's confidential information and trade secrets and the continued loss of Greystone's clients and goodwill.

## III. The Balance of Equities Strongly Favors Greystone

The balance of equities weighs in favor of granting Greystone's requested injunctive relief. As stated above, Greystone stands to suffer imminent and irreparable harm in the absence of its requested relief. CW and King, in contrast, stand to suffer minimal, if any, harm because Greystone's requested relief merely seeks to maintain the status quo.

In situations where a plaintiff seeks "an injunction to foreclose [a party] from benefitting from its misappropriation of [another's] trade secrets," the balance of equities "strongly favors" the movant. *See API Tech. Servs., LLC v. Francis*, No. 4:13-cv-142, 2013 WL 12131381, at *3 (E.D. Va. Dec. 4, 2013) (quotations omitted). First, Greystone's requested relief does not prevent King from servicing any CW clients, it only seeks to prevent their soliciting and servicing clients with whom they had material contact during their employment with Greystone. *See Cap. One Fin.*

*Corp. v. Sykes,* No. 3:20CV763, 2021 WL 2903241, at *15 (E.D. Va. July 9, 2021). Second, Defendants have no legally recognized interest in their continued possession of Greystone's property, including its trade secrets and confidential information. *Id.* Moreover, "any potential hardship Defendants face have been created by their own willful acts in breaching" their Letter Agreements and misappropriating Greystone's trade secrets. *See id.* Where hardships that are borne by a non-movant are self-inflicted, they do not tip the equities in the non-movant's favor. *See id.* (citing *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 596 (3d Cir. 2002)); *Laz Karp Assocs., Inc.*, 2025 WL 3562612, at *7 (quoting *API Tech. Svcs, LLC*, 2013 WL 12131381, at *3) ("Where 'the only harm Defendants would suffer is the self-inflicted harm that comes to those who base their businesses on trade secrets stolen from a competitor, … a balancing of the equities strongly favors granting an injunction."); *NaturaLawn of Am., Inc. v. W. Grp., LLC*, 484 F. Supp. 2d 392, 403 (D. Md. 2007) (discounting potential burden on non-movants where burden was "self-inflicted" as a result of ignoring enforceable agreement). For these reasons, the balance of equities favors Greystone's request to enter a TRO and preliminary injunction in order to maintain the status quo.

## IV. An Injunction Serves the Public Interest

The public interest favors an injunction under these circumstances. "Courts within the Fourth Circuit recognize that 'public interest favors the protection of confidential business information and the enforcement of valid contracts.'" *Variable Annuity Life Ins. Co.,* 535 F.Supp.3d at 519 (quoting *Fidelity Glob. Brokerage Grp., Inc. v. Gray,* No. 1:10CV1255, 2010 WL 4646039, at *4 (E.D. Va. Nov. 9, 2010)). Greystone owns its trade secrets and confidential information, and the secret status of that information has been pirated by King despite his contractual obligations to prevent its use or disclosure after their employment period for the benefit of CW. "The public has an interest in allowing companies like [Greystone] to protect confidential

information, to obtain temporary injunctive relief to enjoin any further breach or disclosure, and ultimately to avoid irreparable harm and the destruction of incentives to develop proprietary information." *Cap. One Fin. Corp.*, 2021 WL 2903241, at *15. Thus, the public interest here clearly favors Greystone's requested injunction.

## V. The Scope of Greystone's Requested Injunctive Relief is Proper

"[I]t is well-established . . . that a federal district court has wide discretion to fashion appropriate injunctive relief in a particular case." *Roe v. Dep't of Def.*, 947 F.3d 207, 231 (4th Cir. 2020), *as amended Jan. 14, 2020*. Here, Greystone's requested relief is necessary to preserve the status quo and narrowly tailored in that it seeks only to prevent further misappropriation of its trade secrets and to hold King to his post-employment obligations. To that end, Greystone seeks a TRO (i) preventing King from soliciting Greystone's employees and clients for the twelve (12) month period following the termination of his employment with Greystone, and (ii) preventing all Defendants from accessing, using, disclosing, modifying or deleting Greystone's confidential, proprietary, and/or trade-secret information in their possession, custody, or control. This narrowly tailored relief is "no more burdensome to the defendant[s] than necessary to provide complete relief to" Greystone. *Variable Annuity Life Ins. Co.*, 535 F.Supp.3d at 521 (quoting *Roe*, 947 F.3d at 231).

## VI. Bond

Greystone will post adequate security for injunctive relief as required by Federal Rule of Civil Procedure 65(c). For the TRO, Greystone asks that the Court require only a cash bond of $2,500.00 or less, payable by cash or check. The process to obtain a surety bond takes longer, and Greystone needs the TRO to issue immediately.

## CONCLUSION

Because Greystone will succeed on the merits of its Misappropriation of Trade Secrets and Breach of Contract claims and will suffer irreparable harm in the absence of it requested injunction, and the balance of equities and public interest favor entry of that injunction, the Court should issue a TRO and preliminary injunction and grant the relief Greystone requests herein.

Dated: July 7, 2026

Respectfully submitted,

*/s/ Jon M. Talotta*

Jon M. Talotta (VSB No. 44590)
Samuel W. Yergin (VSB No. 93862)
HOGAN LOVELLS CADWALADER US LLP
8350 Broad Street, 17th Floor
Tysons, VA 22102
Tel: 703-610-6100
Fax: 703-610-6200
jon.talotta@hlc.com
samuel.yergin@hlc.com

Michael E. DeLarco (*pro hac vice forthcoming*)
HOGAN LOVELLS CADWALADER US LLP
390 Madison Ave.
New York, NY 10017
Tel: 212-918-3000
Fax: 212-918-3100
michael.delarco@hlc.com

Andrew T. Simmons (*pro hac vice forthcoming*)
HOGAN LOVELLS CADWALADER US LLP
1735 Market St., Twenty-third Floor
Philadelphia, PA 10017
Tel: 267-675-4600
Fax: 267-675-4601
andrew.simmons@hlc.com

*Counsel for Plaintiff Greystone Servicing Company, LLC*

## **CERTIFICATE OF SERVICE**

I certify that on July 7, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system. Due to the emergency nature of this action, a true and accurate copy of the foregoing is being served on the following via federal express (overnight) and electronic mail:

Ronald W. Taylor
Venable LLP
750 E. Pratt Street, Suite 900
Baltimore, MD 21202
RWTaylor@venable.com

/s/ *Jon M. Talotta*
Jon M. Talotta