**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**(Alexandria Division)**

**GREYSTONE SERVICING COMPANY LLC,**

***Plaintiff,***

***v.***

**CWCAPITAL ASSET MANAGEMENT LLC, et al.,**

***Defendants.***

**Case No.: 1:26-cv-02014**

# DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR EXPEDITED DISCOVERY


Nicholas M. DePalma (VSB No. 72886)
Taylor S. Chapman (VSB No. 81968)
Christian R. Schreiber (VSB No. 89544)
VENABLE LLP
1850 Towers Crescent Plaza, Suite 400
Tysons Corner, VA 22182
(703) 760-1600 (phone)
(703) 821-8949 (fax)
nmdepalma@venable.com
tschapman@venable.com
crschreiber@venable.com

*Counsel for Defendants CWCapital Asset Management LLC and David King*

## Table of Contents

Introduction....................1

Summary of Factual Allegations....................1

Legal Standard....................3

Argument....................4

I. Greystone fails to make a strong showing of likelihood of success on the merits....................4

A. Speculation is not enough....................4

B. Third-party declarations show that customers were moving business away from Greystone for reasons unrelated to the challenged conduct....................5

C. Greystone is unlikely to prevail on the merits of its trade secrets claim, as shown by the preliminary analysis of expert Darren Gluck....................6

D. Greystone is unlikely to prevail on the merits of its breach of contract and tortious interference claims....................9

1. The Letter Agreements are likely not enforceable....................10

2. The non-solicitation provisions are likely not enforceable....................11

3. Greystone is likely estopped from enforcing non-solicitation against King....................16

4. Greystone fails to demonstrate an enforceable purchase agreement or business expectancies, and any breach thereof....................17

5. Defendants did not cause Greystone its alleged harm....................17

II. Greystone fails to make a strong showing of irreparable harm....................18

A. Greystone's delay demonstrates there is no irreparable harm....................18

B. Greystone can be compensated through money damages....................19

III. The discovery sought is overly broad and not narrowly tailored to an emergency....................20

IV. Alternatively, if the Court authorizes expedited discovery, then the Court should also order Greystone to produce discovery....................22

Conclusion....................23

Defendants CWCapital Asset Management LLC ("CW") and David King, by counsel, submit this Memorandum in Opposition to Plaintiff Greystone Servicing Company LLC's ("Greystone") Motion for Expedited Discovery (Dkt. 10).

## Introduction

Courts in Virginia ask whether a party seeking expedited discovery makes a strong showing of success on the merits and whether irreparable harm is likely in the absence of such discovery. Here, Greystone fails to make either showing. As demonstrated by third-party affidavits, Greystone's theory that King and CW caused Greystone to lose business or employees is unsupported, speculative, and incorrect. Additionally, Greystone will not suffer irreparable harm (as demonstrated by the seven-month delay in bringing this motion after King's departure). And Greystone could be made whole with money damages. Finally, the discovery sought by Greystone is overly broad and not narrowly tailored to any emergency issue. If this case proceeds, then Greystone will receive full discovery in the ordinary course on this Court's regular schedule.

## Summary of Factual Allegations

Greystone alleges that its Special Servicing Division ("SSD") is a component of Greystone's loan servicing business, working in the management and resolution of distressed or non-performing commercial real estate loans. Compl. ¶¶ 23-24. Greystone alleges that, beginning in 2024, Greystone sought to sell its SSD business. *Id.* ¶ 38. From 2024 to 2025, Greystone actively sought to sell its SSD business to multiple prospective buyers, including to CW and at least two other companies. *See id.* ¶¶ 38, 40, 43. Perhaps unsurprisingly, these prolonged sale discussions and uncertainty took their toll on Greystone's employees.

On October 28, 2025, King expressed concerns to Steve Rosenberg, Greystone's CEO, that there would not be a job for King if the prospective buyer at the time acquired Greystone, and so to protect his ability to earn a living and provide for his family, King emailed Rosenberg asking

him to release or clarify King's non-solicitation obligations. *See* Compl. ¶ 44 & Ex. 8. Two days later, Rosenberg responded in part: "David, I would never want to restrict you in any way and want to continue working with you either in your current capacity or in some other. I appreciate you reaching out, but I never want to put you or your family in any sort of uncomfortable restricted position." Compl. Ex. 8. Rosenberg then asked King to let him know "***if*** you'd like to have a conversation on this topic." *Id.* (emphasis added). Rosenberg and King never had that conversation; thus, Greystone left King with these assurances. *See* Compl. ¶ 45. King submitted his resignation on November 14, 2025, and left his employment with Greystone on November 28, 2025 (more than seven months ago), joining CW. *Id.* ¶¶ 44, 49. Greystone did not send King a letter or notify him that he was bound by any non-solicitation obligations or restrictive covenants.[1]

Later, on December 12, 2025, Greystone employee Jason Price submitted his resignation, effective December 31, 2025. *Id.* ¶ 62. On February 11, 2026, Greystone employee Mary English resigned, leaving Greystone on February 19, 2026. *Id.* ¶ 63. Around this time, Greystone alleges that Price and English communicated with another Greystone employee, Debra Cook, who did not leave. *Id.* ¶ 64. On February 12, 2026, Greystone sent letters to Price and CW informing them of Price's non-solicitation obligations. *Id.* ¶ 65 & Exs. 15-16.

Greg Frederking, another Greystone employee, submitted his resignation on May 1, 2026 and left his employment with Greystone on May 15, 2026. Compl. ¶¶ 67-68. Greystone now speculates that these employees left as part of a conspiracy and misappropriation of trade secrets, and that this caused Greystone to lose clients, specifically Prime Finance Advisor, L.P. ("Prime") and 400 Capital Management, LLC ("400 Capital"). *See id.* ¶¶ 6-12. Greystone wants to now bootstrap its motion for expedited discovery and for emergency relief onto this speculation.

---

[1] Greystone did not write King until six months later on May 27, 2026. Compl. Ex. 18.

The problem for Greystone, however, is that its allegations are equally consistent with employees leaving in the ordinary course (particularly in the uncertain environment Greystone created with a sale), King being above-board with Greystone about his restrictive covenants (and Greystone seeming to agree not to enforce them—as shown in Complaint Ex. 8 and by Greystone's conduct), and clients moving elsewhere as they do from time to time. Had Greystone spoken with its allegedly lost clients (Prime and 400 Capital) before filing this lawsuit, then Greystone would have learned that their decisions to move business from Greystone were unrelated to any employees moving to CW. *See* Declaration of Quinn Barton of 400 Capital (attached as **Exhibit 1**), ¶¶ 6-13; Declaration of Lyndsay Stephenson of Prime (attached as **Exhibit 2**), ¶¶ 5, 7-13. Finally, absent from Greystone's Complaint are any allegations about its many other employees leaving Greystone around this time (and not going to CW), where they went, and whether Greystone's SSD lost any other business (and to whom).

**Legal Standard**

"Courts in the Eastern District of Virginia apply a modified preliminary injunction test to determine whether expedited discovery is warranted." *See Heshan Jiahojia Sanitary Ware Indus., Co., Ltd. v. Unincorporated Ass'ns*, 2025 WL 3006037, at *3 (E.D. Va. Oct. 27, 2025) (denying motion for expedited discovery). This is a "more demanding standard than the good cause test, and better aligns with the Supreme Court's emphasis that emergency relief should be granted only in unusual or extraordinary circumstances." *Id.* at *3 n.8; *see also ForceX, Inc. v. Tech. Fusion LLC*, 2011 WL 2560110, at *7 (E.D. Va. June 27, 2011) (cited by Greystone) (denying motion for expedited discovery); *Kia Motors Am., Inc. v. Greenbrier GMC, Inc.*, 2020 WL 8970813, at *3 (E.D. Va. Dec. 11, 2020) (denying motion for expedited discovery where "KMA's requests are not narrowly tailored to a demonstrably urgent need").

The core inquiry for this Court is whether Greystone makes a "strong showing of success

on the merits" and a showing that irreparable harm is "likely." *ForceX*, 2011 WL 2560110, at *5.

## Argument

### I. Greystone fails to make a strong showing of likelihood of success on the merits

#### A. Speculation is not enough

Speculation is insufficient to carry Greystone's burden. *See Parson v. Alcorn*, 157 F. Supp. 3d 479, 489–90 & n. 13 (E.D. Va. 2016); *cf. Walker v. Tyler Cnty. Comm'n*, 11 F. App'x 270, 274 (4th Cir. 2001) (finding denial of summary judgment appropriate where verified complaint was based on information and belief without clarity as to what was based on personal knowledge); *Bank of Am. Inv. Servs., Inc. v. Byrd*, 2009 WL 10184606, at *7 (E.D. Va. June 15, 2009) (noting minimal persuasiveness of hearsay affidavits).

Here, Greystone argues that it "is likely to succeed on its claims as the facts and circumstances of Defendants' improper retention of Greystone's trade secrets and confidential information, which King transmitted to his personal email address during his employment, and the swift departure of numerous Greystone employees and clients in the aftermath of King's departure to CW are strong evidence that King disclosed Greystone's confidential, proprietary, and trade-secret information …." Dkt. 11 at 1-2.

Unfortunately for Greystone, this is all speculative. Greystone relies—not on affidavits—but on its own memorandum in support of its motion for a temporary restraining order. That memorandum, in turn, relies—again, not on affidavits—but on its own Complaint, made "upon information and belief." *See* Compl. ¶ 3 (speculating that CW's desire to recruit Greystone personnel was "not incidental"); *id.* ¶ 6 (speculating that King "offered Greystone's confidential information as an incentive"); *id.* ¶ 7 (speculating that King recruited certain Greystone employees); *id.* ¶ 8 (speculating that King and the former Greystone employees "divert[ed] special

servicing business to CW”).

### B. Third-party declarations show that customers were moving business away from Greystone for reasons unrelated to the challenged conduct

Greystone also alleges that it “lost a substantial amount of business from two of its largest special servicing clients: [400 Capital] and [Prime].” Compl. ¶ 12.

Defendants CW and King submit declarations from 400 Capital and from Prime. These declarations show that 400 Capital and Prime moved their business away from Greystone and to other special servicers, for independent business reasons.

Specifically, in the Declaration of Quinn Barton, the Head of Commercial Mortgage-Backed Securities (“CMBS”) and CRE Strategy at 400 Capital, Mr. Barton explains that he is “responsible for decisions regarding the selection of special servicers.” Ex. 1, Barton Decl. ¶ 4. Mr. Barton further explains that he knows Defendant King (*id.* ¶ 5), but his decision to “move special servicing from Greystone to CW (and elsewhere) was unrelated to any Greystone employee moving from Greystone to CW” (*id.* ¶ 10), and that “King and Greg Frederking’s employment status had ***no impact*** on 400 Capital’s independent business judgment regarding what special servicer should be engaged for CMBS deals ….” *Id.* ¶ 11 (emphasis added).

In the Declaration of Lyndsay Stephenson, a Managing Director of Prime, Ms. Stephenson explains that she is the decisionmaker for managing “service partner selection.” Ex. 2, Stephenson Decl. ¶ 4. “Prime Finance’s decision to move business from Greystone was unrelated to any Greystone employee moving to CW Capital.” *Id.* ¶ 11. “King had ***no impact*** on Prime Finance’s independent business judgment regarding which special servicer to engage for a particular transaction” and “[t]he same is true for any other employees who were at CW or Greystone or who left Greystone’s employment for CW—including Greg Frederking.” *Id.* ¶ 12 (emphasis added).

Both Mr. Barton and Ms. Stephenson confirmed that they were existing CW clients well

before any of the complained-about Greystone employees moved to CW. *See id.* ¶ 5 (Prime's relationship with CW dates to 2020); Ex. 1, Barton Decl. ¶ 5 (400 Capital had a longstanding, continuous business relationship with CW that predates King). Both Mr. Barton and Ms. Stephenson underscore that they sent work ***away from Greystone*** due to independent business considerations, not due to King or any other employee, and that they sent work to CW ***and to servicers other than CW***. Greystone's contrary speculation that its "losses were not the result of ordinary competition" (Compl. ¶ 82) cannot overcome this evidence.

Greystone could have picked up the phone and asked either Mr. Barton or Ms. Stephenson why they were moving business away from Greystone. It is unclear why Greystone decided not to make these calls—but the result is that Greystone presents an inaccurate narrative.

### C. Greystone is unlikely to prevail on the merits of its trade secrets claim, as shown by the preliminary analysis of expert Darren Gluck

"Failing to prove the existence of a 'trade secret' dooms a misappropriation claim." *Synopsys, Inc. v. Risk Based Security, Inc.*, 70 F.4th 759, 769 (4th Cir. 2023). To qualify as a trade secret, the information must "derive[] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3) (DTSA); *see also* Va. Code § 59.1-336 (VUTSA); Tex. Civ. Code § 134A.002(6) (TUTSA); D.C. Code § 36-401(4) (D.C.UTSA). "For ease of reference, we refer to the two elements of the trade secret definition by the shorthand requirements of 'independent economic value' and 'reasonable secrecy.'" *Synopsys*, 70 F.4th at 769. "Not everything with commercial value constitutes a trade secret," *id.* at 772, and the value of the trade secret must be "specifically tied to secrecy." *Id.* at 771 (citing *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1012 (1984)).

Here, although absent from Greystone's memorandum, it appears that the trade secrets at

issue are those cited on page 7 of Greystone's TRO memorandum (Dkt. 7), which in turn cites to the Complaint. Greystone's alleged trade secrets are thus limited to: (1) King's email account address book; (2) a list of Greystone's securitizations; (3) Greystone's top 20 loans by revenue generation; (4) information about 400 Capital; (5) pitch material for an opportunity that Greystone "elected not to pursue"; and (6) Greystone's bond portfolio. Dkt. 7 at 7.

Like Greystone's unsupported speculation about why certain clients moved business from Greystone, Greystone provides no evidence that these files are trade secrets. Greystone did not submit the files to this Court, and Greystone did not submit a declaration satisfying the bare elements of a trade secrets claim as to each file. Regardless, CW and King retained an expert in the CMBS industry and submit the Declaration of Darren J. Gluck, an expert with more than 20 years in the CMBS market. **Exhibit 3**. Gluck reviewed Greystone's allegations as to each file on a preliminary basis and determined that it is highly unlikely any file contains true trade secrets, and further that the competitive value of such information is low. This is due in part to the public reporting requirements of CMBS assets, which require public disclosure on a regular basis with the SEC's EDGAR system. Ex. 3, Gluck Decl. ¶ 14. This includes "monthly remittance reports" that include "the name of the special servicer." *Id.* ¶ 15. Gluck's analysis includes the following:

**Email account address book.** Greystone alleges that this file is "comprised of contacts at … issuers, controlling class representatives ('CCR'), brokers, and Greystone customers." Compl. ¶ 53 (footnote omitted).[2] However, Gluck opines that "the identities and contact information of CMBS market participants are widely known and readily ascertainable …." Ex. 3, Gluck Decl.

[2] This misstates the nature of this file. Exhibit 9 to Greystone's Complaint shows that this is a "Stream_Autocomplete_*.dat" file, which is a kind of cache file that Microsoft Outlook creates that functions by displaying suggestions of email addresses when a user begins addressing an email. In contrast, an address book is typically stored as part of a .pst or .ost file, and exported using a .csv.

¶ 30. Accordingly, this information is unlikely to be a trade secret.

**List of Securitizations and CCRs.xlsx.** Greystone alleges that this file contains "a confidential, detailed list of *all* of Greystone's SSD securitizations and the relevant CCR." Compl. ¶ 54. However, Gluck explains that this information is "commonly reported and tracked in the industry." Ex. 3, Gluck Decl. ¶ 33. Further, "every special servicer must file an annual Regulation AB Report, which details all Trusts for which they were the named special servicer for the reporting year." *Id.* Thus, this information is unlikely to be a trade secret.

**Top_20_SS_Loans_by_Fees_10.31.2025.xlsx.** Greystone alleges that this file contains "information regarding the SSD's top 20 loans by revenue generation assumptions, including Greystone's proposed strategy for resolving the special status of each loan." Compl. ¶ 55. Again, like the list of securitizations, this is substantially publicly available. As Gluck explains, "I could look up publicly available information (including on EDGAR), as well as utilize commercial data providers such as Bloomberg and Trepp, to project Greystone's top 20 SS loans by fees." Ex. 3, Gluck Decl. ¶ 36. Here again, this information is unlikely to be a trade secret.

**400CM - NI Watchlist Reporting.xlsx.** Greystone alleges this file contains "information relating to potential special servicing deals involving a Greystone client, 400 Capital." Compl. ¶ 56. However, Gluck explains that "watchlist or special servicing status, delinquency information, loan seller agreements, and loan performance information are commonly reported and tracked…. In my opinion, the Watchlist spreadsheet, as described, is unlikely to constitute information that derives independent economic value from secrecy." Ex. 3, Gluck Decl. ¶¶ 38-39.

**Greystone CMBS B-Piece Presentation.New Version.pdf.** Greystone alleges that this file contains "pitch material related to an opportunity that Greystone elected not to pursue but nevertheless reveals Greystone's confidential business strategies and insights." Compl. ¶ 57. As

alleged, this presentation was created for distribution to prospective institutional investors. Such a purpose is fundamentally at odds with an expectation of secrecy. Regardless, Gluck again opines that it "seems unlikely that there is a trade secret" and that if it "contains information related to servicing for third-party B-piece buyers, this data is substantially public, industry known, or otherwise readily available…." Ex. 3, Gluck Decl. ¶ 41.

**Greystone_Bond_Portfolio.xlsx.** Greystone alleges that this file contains "information pertaining to Greystone's *entire* owned-bond portfolio." Compl. ¶ 58 (emphasis in original). However, "bond ownership has nothing to do with the third-party CCR control bond positions or employee solicitation issues presented by this lawsuit." Ex. 3, Gluck Decl. ¶ 43. Thus, although certain portions of this document might not be public, "it is unlikely that there is any value (let alone competitive value) in knowing whether Greystone holds a minority interest in some bond." *Id.* "This is because the only bondholder that can select a special servicer is the majority owner…." *Id.* Accordingly, it is unlikely that this information is a trade secret or that it rises to the level of an emergency.

### D. Greystone is unlikely to prevail on the merits of its breach of contract and tortious interference claims

To establish breach of contract, Greystone must establish that: (1) King has a legally enforceable obligation to Greystone; (2) breach of that obligation; and (3) injury or damage to Greystone caused by the breach. *Am. Conservative Union v. Inst. for Legis. Analysis,* 2025 WL 510236, at *11 (E.D. Va. Feb. 13, 2025) (citing *Filak v. George*, 267 Va. 612, 614 (2004)). Similarly, to establish tortious interference, Greystone must show: "(1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage …." *Dunlap v. Cottman Transmission*

*Sys., LLC*, 287 Va. 207, 216 (2014).

Here, Greystone fails on all these elements. Most notably, Greystone fails to establish valid contracts or expectancies and legally enforceable obligations, and Greystone fails to establish that Defendants caused Greystone its alleged damages.

**1. The Letter Agreements are likely not enforceable**

Greystone alleges that: King breached his Letter Agreement (Count II); CW tortiously interfered with King's Letter Agreement (Count III); and CW and King tortiously interfered with the Letter Agreements of Price, English, and Frederking (Counts III and IV).

But these Letter Agreements are not enforceable contracts. The Letter Agreements each explicitly state that the employee "understand[s] this offer of employment is not an employment contract, ***nor can it be used to create one***." Compl. Ex. 1 at 4 (beneath "Acknowledged and Agreed") (emphasis added); *see also* Compl. Exs. 2-4 at 4 (beneath "Signed and Acknowledged"). "Under Virginia law, courts must construe the language of the contract as written; courts cannot make a new contract for the parties different from that plainly intended." *Atlantic Cas. Ins. Co. v. Connection Auto Sales, Inc.*, 508 F. Supp. 3d 10, 15 (E.D. Va. 2020). It is also "elementary that mutuality of assent—the meeting of the minds of the parties—is an essential element of all contracts." *Phillips v. Mazyck*, 273 Va. 630, 636 (2007). Mutual assent is determined "exclusively from those expressions of [the parties'] intentions which are ***communicated*** between them." *Moorman v. Blackstock, Inc.*, 276 Va. 64, 75 (2008) (alteration and emphasis in original); *Norfolk S. Ry. Co. v. Zayo Grp., LLC*, 87 F.4th 585, 589 (4th Cir. 2023) ("Under Virginia law, [courts] 'must give effect to the intention of the parties as expressed in the language of their contract.'"). Virginia courts have found that there is no mutuality of assent where the document at issue "in very clear and unambiguous terms firmly renounces its intent to form a contract with any of its employees affected thereby." *Meade v. Appalachian Power Co.*, 11 Va. Cir. 235, 1988 WL 619179,

at *4 (Washington Cir. Ct. Apr. 5, 1988) (no meeting of the minds where employee handbook stated that it was "not to be regarded as creating between the company and its employees a contract of employment either express or implied").

Greystone contends that the disclaimer is "located within a provision of the agreement addressing 'at-will' employment." Dkt. 7 at 19. However, the Letter Agreements contain entirely separate sections labeled "At-Will Employment," which outline the conditions of the employee's at-will employment and do not include the broad disclaimer rendering the Letter Agreement unenforceable as an employment contract.[3] *See* Compl. Exs. 1-4 (at "At-Will Employment"). Where "[t]here [is] nothing technical, obscure, or ambiguous in the wording of the agreement," unstated contrary interpretations "would not justify a conclusion directly contrary to the meaning of the plain language of the agreement," particularly unstated contrary interpretations held by a sophisticated party. *Wells v. Weston*, 229 Va. 72, 79 (1985).

Further, even if the Court were to determine that the Letter Agreement disclaimer was ambiguous, Virginia courts have "consistently held" that "such ambiguity must be construed against the drafter of the agreement." *Drs. Co. v. Women's Healthcare Assocs., Inc.*, 285 Va. 566, 573 (2013) (internal citations omitted); *Va. is for Movers*, 720 F. Supp. 3d at 437.

**2. The non-solicitation provisions are likely not enforceable**

Additionally, the non-solicitation provisions, which are the focus of Greystone's breach and tortious interference claims, are likely not enforceable. Virginia applies the same test to non-solicitation clauses that it applies to non-compete clauses. *Lasership Inc. v. Watson*, 79 Va. Cir.

---

[3] "No word or clause in the contract will be treated as meaningless if a reasonable meaning can be given to it[;] and there is a presumption that the parties have not used words needlessly." *Va. is for Movers, LLC v. Apple Federal Credit Union*, 720 F. Supp. 3d 427, 436 (E.D. Va. 2024) (quoting *PMA Cap. Ins. Co. v. U.S. Airways, Inc.*, 271 Va. 352, 358 (2006)) (alteration in original).

205, 2009 WL 7388870, at *8 (Fairfax Cir. Ct. Aug. 12, 2009) (citing *Foti v. Cook*, 220 Va. 800, 805 (1980)). "In Virginia, as elsewhere, non-compete clauses are disfavored restraints on trade." *Lanmark Tech., Inc. v. Canales*, 454 F. Supp. 2d 524, 528 (E.D. Va. 2006); *Simmons v. Miller*, 261 Va. 561, 581 (2001) ("Because restrictive covenants restrain trade, non-competition clauses are strictly construed against the employer.").

The plaintiff-employer must show that the clause: (1) is narrowly drawn to protect the employer's legitimate business interest; (2) is not unduly burdensome on the employee's ability to earn a living; and (3) is not against sound public policy. *Lanmark*, 454 F. Supp. 2d at 528. This analysis considers "the restriction in terms of function, geographic scope, and duration." *Id.* at 528-29 (citing *Simmons*, 261 Va. at 581). Where a non-compete or non-solicit clause is susceptible to at least one interpretation that it "is functionally overbroad," the clause fails even though it may be reasonable as applied to the specific circumstances presented. *Id.* at 529 (citation omitted).

Greystone frames the non-solicitation provision of the Letter Agreements as restricting the employee (e.g., King) "for a period of twelve (12) months immediately following his employment with Greystone from soliciting Greystone's clients with whom he had material contact during his employment, and from soliciting Greystone's employees." Dkt. 7 at 21. This characterization understates the actual scope. The non-solicitation provision restricts the employee from (1) "directly or ***indirectly***" contacting "any entities or individuals who ***were*** customers, clients, or investors of the Greystone Entities[4] at any point during the Employment Period and with whom [King] had material contact . . . for the purpose of soliciting or encouraging to transact business that competes with the Greystone Entities"; (2) "interfer[ing] with or damag[ing] ***any business***

[4] "Greystone Entities" is defined in King's Letter Agreement as Greystone Servicing Company LLC or "any of its parents, subsidiaries, and affiliated entities." Compl. Ex. 1 at 3.

***relationship*** of the Greystone Entities, including, without limitation, any such relationships with Restricted Contacts, suppliers, vendors, consultants, attorneys, or other agents"; and (3) "influenc[ing] any individual who is an employee or independent contractor of the Greystone Entities ***or was an employee or independent contractor of the Greystone Entities*** during the twelve (12) months preceding the date of [King's] termination to . . . apply for or accept employment, work, or an independent contractor relationship with any person or entity other than the Greystone Entities, or . . . otherwise employ or retain any such individual." Compl. Ex. 1 at 3-4 (emphasis added); *see also* Compl. Exs. 2-4 at 3.

Greystone has no legitimate business interest in broadly prohibiting King, Price, English, and Frederking from soliciting, influencing, or encouraging former Greystone employees from applying for work with non-Greystone entities or otherwise employing such individuals. This employee-hiring portion of the non-solicitation provision is not limited to employees with whom these individuals worked directly, employees possessing confidential information, employees servicing any particular client, or even to employment with a direct competitor. Instead, it applies to any individual who was a Greystone employee during the year preceding these individuals' departures, even employees that Greystone terminated or that worked elsewhere after Greystone before communicating with King, Price, English, or Frederking. That is not protecting a legitimate business interest, but rather a restraint on ordinary labor mobility among former co-workers. *See Patient First Richmond Med. Grp. LLC v. Blanco*, 2011 WL 9175245 (Va. Beach Cir. Ct. Feb. 15, 2011) (finding that a non-solicitation provision prohibiting an employee from "directly or indirectly . . . solicit[ing] or induc[ing], or attempt[ing] to solicit or induce, any person who was employed by [the employer] at any time during the twelve (12) month period immediately preceding the termination of [employee's] employment to leave the employment of [the employer]

for any reason whatsoever, or to hire any such individual so employed by [the employer]" lacked a legitimate business interest); *Strategic Enterprise Solutions, Inc. v. Ikuma*, 77 Va. Cir. 179, 2008 WL 8201356, at *4 (Fairfax Cir. Ct. Oct. 7, 2008) (finding that non-solicitation provision concerning former employees did "not limit employees from competing directly with the former employer or through employment with a direct competitor" was overbroad and unenforceable).

"[T]he proffer of a legitimate business interest to support a non-compete clause only begins the analysis because the specific non-compete clause in issue must also be 'reasonable in the sense that it is no greater than is necessary to protect' an employer's legitimate business interest." *Lanmark*, 454 F. Supp. 2d at 529. Under the express terms of the Letter Agreements, these individuals cannot (1) encourage, either directly or indirectly, any current or former customers of Greystone with whom he/she had meaningful interactions to transact business with a competing entity, regardless of the type of business transaction or whether it relates to any of his/her prior contact with them, and regardless of when the individual last interacted with the customer (e.g., the last meaningful interaction could have been 15 years ago and this restriction would still apply); (2) "interfere" or "damage" any business relationship with Greystone, full stop and with no limitations based on the type of business transaction; and (3) "influence" former employees of Greystone to accept work with a competing entity or even "retain" former employees of Greystone. *See* Compl. Ex. 1 at 3-4; Compl. Exs. 2-4 at 3. "Put simply, the clause prohibits a former employee from ***any*** form of employment with a competitor, including work ***unrelated*** to the employee's work at [Greystone]," which "far exceeds [Greystone's] legitimate interest in protecting itself from employees that use business sensitive knowledge and contacts they acquire at [Greystone]." *Lanmark*, 454 F. Supp. 2d at 530 (internal quotation marks omitted) (emphasis in original).

"Virginia courts have appropriately and consistently prohibited such overly-broad non-

compete clauses . . . where, as here, the non-compete clause effectively prohibits the employee from working in virtually any capacity for a competitor, [and] is not narrowly drawn to protect the employer's legitimate business interest ...." *Id.*[5] The absence of any geographical limitation may similarly render the prohibition overbroad, unduly burdensome, and contrary to public policy. *Phoenix Renovation Corp. v. Rodriguez*, 439 F. Supp. 2d 510, 521-22 (E.D. Va. 2006).

Indeed, Greystone's own conduct indicates that it did not believe that these non-solicitation provisions are narrowly tailored to a legitimate business interest. In October 2025, King expressed concerns to Steve Rosenberg, Greystone's CEO, that there would not be a job for King if the prospective buyer acquired Greystone, and so to protect his ability to earn a living and provide for his family, King emailed Rosenberg asking him to release or clarify King's non-solicitation obligations. *See* Compl. ¶ 44 & Ex. 8. In response, Rosenberg confirmed that he would "never want to restrict [King] in any way and want[s] to continue working with [King] either in [his] current capacity or in some other," and that Rosenberg did not "want to put [King] or [King's] family in any sort of uncomfortable restricted position." Compl. Ex. 8.

Where the non-compete clause is deemed overly-broad and restrictive of an employee's ability to work for a competitor in any capacity, it is deemed unduly burdensome on the employee's

---

[5] The provision at issue in *Brainware, Inc. v. Mahan*, 808 F. Supp. 2d 820 (E.D. Va. 2011), a case that Greystone relies upon, is materially different from the non-solicitation provision in the Letter Agreements here. First, the *Brainware* provision contained no blanket prohibition on generally damaging "any business relationship" of Greystone, to include not only clients but also other "suppliers, vendors, consultants, attorneys, or other agents." *Compare* 808 F. Supp. 2d at 823, *with* Compl. Ex. 1 at 3-4. Second, the plaintiff-employer in *Brainware* was engaged in a "narrow and specialized product line" while the defendant-employer offered a "much broader array of products and services." *Id.* at 827. While both Greystone and CW are engaged in the niche business environment of special servicing, Greystone does not limit these non-competes to only the special servicing industry, but rather any financial services offered by Greystone and its affiliated entities. *See, e.g.*, Compl. Ex. 1 at 2-3. Greystone also does not allege that CW "sells numerous products that are not competitive to [Greystone] on which [King] could freely work without violating his Agreement." *Brainware*, 808 F. Supp. 2d at 826.

ability to earn a living. *Lanmark*, 454 F. Supp. 2d at 530-31. This is also especially true where the non-compete fails to define key terms. *Id.*; *see* Compl. Ex. 1 at 2-3 (failing to define numerous terms). While the provision ***could*** be interpreted to limit its scope (as Greystone attempts to do), it "may also be construed to prohibit much more," which means that it "is ambiguous and susceptible to two or more differing interpretations, at least one of which is functionally overbroad," making the clause unenforceable. *Lanmark*, 454 F. Supp. 2d at 531 (finding that "subjecting an employee to such uncertainty" regarding the terms of a non-compete clause "offends sound public policy and thus runs afoul of the third part of the enforceability test").

### 3. Greystone is likely estopped from enforcing non-solicitation against King

"Estoppel arises where one, by his conduct, lulls another into false security and into a position that he would not take only because of such conduct." *United States ex. rel. Humble Oil & Ref. Co. v. Fidelity & Cas. Co.*, 402 F.2d 893, 897 (4th Cir. 1968); *Avino v. DeWys*, 42 Va. Cir. 266, 273 (Fairfax 1997) (same). Here, King asked Greystone to "release me from the non-solicit in my contract." Greystone's CEO replied that he would "never want to restrict [King] in any way and want[s] to continue working with [King] either in [his] current capacity or in some other," and that Rosenberg did not "want to put [King] or [King's] family in any sort of uncomfortable restricted position." Compl. Ex. 8. Greystone then did not follow up with King and did not notify him that he was still bound by any non-solicitation obligations. Accordingly, equity likely will not permit Greystone to now renege on these representations and seek to enforce the non-solicitation provision against King. *See Humble Oil*, 402 F.2d at 897-900 (party estopped from pleading statute of limitations defense where other party had relied upon a promise and failed to bring action within limitations period); *Avino*, 42 Va. Cir. at 272-73 (plaintiff estopped from taking an inconsistent position where defendants justifiably relied on plaintiff's prior statements and conduct).

#### 4. Greystone fails to demonstrate an enforceable purchase agreement or business expectancies, and any breach thereof

Greystone also alleges tortious interference with its purchase agreement ("APA") with the prospective buyer for the SSD (Count V) and Greystone's business relationships with the buyer and clients (Count VI). Greystone fails to present any evidence of a valid and enforceable contract between Greystone and its prospective buyer. Absent from the record are the contract itself, or even the identity of the buyer. Similarly lacking from the record is evidence of "a reasonable certainty that absent [Defendants' alleged] intentional misconduct, plaintiff would have continued in the relationship or realized the expectancy" with its clients or buyer—as required. *Beacon Sales Acquisition, Inc. v. Cameron Ashley Bldg. Prods., Inc.*, 2025 WL 3721684, at *14 (E.D. Va. Dec. 23, 2025).

Further, Greystone has not alleged that there has been any breach of the APA, nor any termination of the relationship. Rather, Greystone merely alleges that certain closing conditions did not occur, and that the buyer wants to pay 40% less. *See* Compl. ¶¶ 12, 77, 111. This fails to satisfy a required element of Greystone's claims.

#### 5. Defendants did not cause Greystone its alleged harm

Greystone fails to make a showing that any alleged breach or interference caused the complained of injury to Greystone. The alleged injuries are the loss of clients/business and the decrease in purchase price (following the loss of employees). Compl. ¶¶ 80, 82, 84. As referenced above, though, Greystone's clients, Prime and 400 Capital, decided to move business from Greystone to CW. Such decisions were made independently based on their independent business judgment and were unrelated to any employees moving from Greystone to CW, and King had no impact. *See* Ex. 1, Barton Decl. ¶¶ 6-13; Ex. 2, Stephenson Decl. ¶¶ 5, 7-13.

## II. Greystone fails to make a strong showing of irreparable harm

### A. Greystone's delay demonstrates there is no irreparable harm

It is well established that Greystone must make a "clear showing" of irreparable harm that must be both "actual" and "immediate." *Direx Israel, Ltd. v. Breakthrough Med. Corp.,* 952 F.2d 802, 812 (4th Cir. 1991) (finding no irreparable harm in trade secret case). Delay in seeking an injunction indicates the absence of such immediate harm. *See Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel*, 872 F.2d 75, 80 (4th Cir. 1989) (affirming denial of preliminary injunction); *Provident Pharm., Inc. v. Amneal Pharms. LLC,* 2008 WL 3843505, at *4 (E.D. Va. Aug. 15, 2008) (denying preliminary injunction after delay).

Here, King requested release from his non-solicitation restriction on October 28, 2025, resigned on November 14, 2025, and left his employment with Greystone on November 28, 2025, immediately joining CW. Compl. ¶¶ 44, 49. This is when Greystone alleges King emailed himself certain files. Compl. ¶¶ 53-58. This was all information in Greystone's possession at the time (November 2025). Yet Greystone did not send a cease-and-desist letter to King until May 27, 2026 (Compl. ¶ 78), and Greystone did not file for an injunction until July 7, 2026—more than seven months later. Similarly, Jason Price resigned from Greystone on December 12, 2025, and informed Greystone that he would be joining CW—also nearly seven months before Greystone filed suit. Compl. ¶ 62. Greystone sent cease-and-desist letters to Price and CW related to alleged solicitation concerns on February 12, 2026. Compl. ¶ 65. But, again, Greystone did not file suit seeking an injunction until nearly five months later. Courts deny preliminary injunctions based on even shorter delays. *See Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985) (ten-week delay); *Southtech Orthopedics, Inc. v. Dingus*, 428 F. Supp. 2d 410, 420-21 (E.D.N.C. 2006) (six-week delay); *Baer v. Nat'l Bd. of Med. Exam'r*, 392 F. Supp. 2d 42, 49 (D. Mass. 2005) (three-month

delay); *see also Signature Flight Support Co. v. Landow Aviation Ltd. P'ship*, 2009 WL 111603, at *5-6 (E.D. Va. Jan. 14, 2009) (nine-month delay).

**B. Greystone can be compensated through money damages**

"[I]rreparable harm occurs when the threatened injury impairs the court's ability to grant an effective remedy … typically when monetary damages are difficult to ascertain or are inadequate." *Roe v. Shanahan*, 359 F.Supp.3d 382, 418-19 (E.D. Va. 2019). Irreparable harm does not exist if the party seeking injunctive relief can be adequately compensated through monetary damages. *See Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) ("The possibility that adequate compensatory or other corrective relief will be available at a later date ... weighs heavily against a claim of irreparable harm. A plaintiff must overcome the presumption that a preliminary injunction will not issue when the harm suffered can be remedied by money damages at the time of judgment." (internal citation omitted)).

Here, if what Greystone alleges is true, then Greystone alleges that the complained-of conduct decreased the purchase price by 40%. Compl. ¶¶ 12, 126. This seems like an extraordinary overreach, but if Greystone can prove these allegations, then Greystone will be entitled to damages. Although Greystone argues that the loss of customers and goodwill presents irreparable harm (Dkt. 7 at 25-26), here any such harm would be harm to the asset that Greystone is seeking to sell—its SSD business—and thus has directly quantifiable monetary value. This distinguishes the instant case from the cases Greystone relies upon in its TRO brief, which did not involve the pending sale of an asset where the prospective buyer quantified the alleged harm. *See also Integrity Sols., Ltd. v. MCS Consulting, Inc.,* 2024 WL 4252819, at *4 (D. Colo. Sept. 20, 2024) (denying injunction where "Plaintiff expressly pleaded a monetary remedy in liquidated damages for Defendants' alleged misappropriation of trade secrets …. The fact that Plaintiff … claim[s] specific monetary

damages … is countervailing to a showing of irreparable harm.”); *Berliner Foods Corp. v. Pillsbury Co.*, 633 F. Supp. 557, 559 n.3 (D. Md. 1986) (noting plaintiffs “belied a contention that monetary relief cannot effectively be had” based on alleged harm of delta in purchase price); *Va. Carolina Tools, Inc. v. Int’l Tool Supply, Inc.*, 984 F.2d 113, 120 (4th Cir. 1993) (affirming denial of injunction where losses borne out of failed sale and accompanying loss of distributor agreements, sales, and profits were both highly speculative “and largely economic injuries [that] did not constitute irreparable harm”).

## III. The discovery sought is overly broad and not narrowly tailored to an emergency

Greystone seeks the following:

1. One deposition of King, unlimited in time or scope (Dkt. 11 at 4);
2. One Rule 30(b)(6) deposition of CW with a Rule 30(b)(6) notice containing almost four pages of 19 convoluted definitions, plus another 13 wide-ranging topics (Dkt. 11-1);
3. 27 requests for admission to CW (Dkt. 11-2);
4. 13 requests for the production of documents to CW (Dkt. 11-3);
5. Nine interrogatories to CW (Dkt. 11-4);
6. 32 requests for admission to King (Dkt. 11-5);
7. 14 requests for production of documents to King (Dkt. 11-6); and
8. 13 interrogatories to King (Dkt. 11-7).

This is wide-ranging merits discovery, and it is not necessary to address an emergency. Many of Greystone’s requests would be overbroad, unduly burdensome, and not proportional to the needs of the case even for full merits discovery. For example, Greystone’s Rule 30(b)(6) deposition topics include: “All communications among CW personnel and between CW and any third party concerning recruiting, hiring, or obtaining personnel from Greystone’s SSD,” without any time limitation; “CW’s efforts to identify, solicit, obtain, transfer, or retain servicing business

from any current, former, or prospective Greystone client, customer, CCR, investor, counterparty, or business relationship, including Prime and 400 Capital," but which are otherwise not defined, "from January 1, 2025, to the present"; and "CW's communications with Prime, 400 Capital, or any other current or former Greystone client," which are again undefined, "concerning: (a) employment of former Greystone personnel; (b) transfer of servicing business; (c) replacement of Greystone as special servicer; or (d) Greystone's SSD sale process," without any time limitation. Dkt. 11-1 at 4-5 (Topics 3 and 9-10).

Greystone's document requests include requests for: "All documents and communications concerning any solicitation, recruitment, interview, employment discussion, or employment opportunity involving any current or former Greystone employee," without any time limitation; "All documents and communications concerning Prime, including any solicitation, business opportunity, servicing opportunity, transfer of servicing work, onboarding, transition, engagement, proposal, pitch, presentation, or business development effort," without any time or subject matter limitation; and "All documents and communications concerning 400 Capital, including any solicitation, business opportunity, servicing opportunity, transfer of servicing work, onboarding, transition, engagement, proposal, pitch, presentation, or business development effort," without any time or subject matter limitation. Dkt. 11-3 at 8 (Requests 4-6).

Like the plaintiff in *ForceX*, Greystone might say it wishes to "find out more about Defendants… to prevent customer and revenue loss before it occurs through improper means." *ForceX*, 2011 WL 2560110 at *7. But that is not appropriate for emergency discovery. "Although the potential loss of customers to ForceX would no doubt have an effect on their revenues and client good will, this is not an unusual type of harm…. The Plaintiff has made no showing that irreparable harm will occur in this instance without expedited discovery, nor have they

demonstrated any unusual circumstances which would cause the Court to order a divergence from the typical discovery timeline." *Id.* Ultimately, the plaintiff would "receive all of the information that they have requested in this motion" in the ordinary course. *Id.* Here, Greystone's requests go even beyond what Greystone could seek in the ordinary course.

## IV. Alternatively, if the Court authorizes expedited discovery, then the Court should also order Greystone to produce discovery

Solely if this Court orders expedited discovery, then Greystone should also be required to provide discovery, on the same timetable, of at least the following:

1. Provide the date, under oath, that Greystone first learned that King forwarded information from his Greystone email account to his Gmail account;

2. If Greystone did not intend to release King from the Letter Agreement, explain why Steve Rosenberg, Greystone's CEO, told King that he "would never want to restrict [him] in any way" and why Greystone did not send any correspondence to King until May 27, 2026—approximately six months after his departure;

3. Provide a list of all employees who departed Greystone's SSD after Greystone announced in 2024 that it was selling the SSD, when each departure happened, and where they are working;

4. Provide a list of all business lost by the SSD since Greystone announced in 2024 that it was selling the SSD and, if known, identify who is currently servicing that business;

5. Provide a list of all persons or entities which have access to any of the information in the alleged trade secrets forwarded by David King from his Greystone email account to his Gmail account;

6. Explain how Greystone alleges that each trade secret caused it to lose business from 400 Capital and Prime;

7. Provide all documents regarding employee complaints or concerns regarding the work environment, the potential sale of the SSD, and/or the workload at Greystone since 2024;

8. For each departed employee at issue, provide their personnel file, including their compensation history; and

9. Explain every reason known by Greystone or provided to Greystone as to why the SSD buyer renegotiated the APA and or believed that Greystone had not met all closing conditions and produce all documents regarding the same.

## Conclusion

For the foregoing reasons, CW and David King respectfully request that the Court deny Greystone's motion.

Dated: July 15, 2026

Respectfully submitted,

*/s/ Nicholas M. DePalma*

Nicholas M. DePalma (VSB No. 72886)
Taylor S. Chapman (VSB No. 81968)
Christian R. Schreiber (VSB No. 89544)
VENABLE LLP
1850 Towers Crescent Plaza, Suite 400
Tysons Corner, VA 22182
(703) 760-1600 (phone)
(703) 821-8949 (fax)
nmdepalma@venable.com
tschapman@venable.com
crschreiber@venable.com

*Counsel for Defendants CWCapital Asset Management LLC and David King*

# CERTIFICATE OF SERVICE

I hereby certify that on July 15, 2026, a copy of the foregoing was served, via the Court's electronic filing system, on the following counsel of record:

Jon M. Talotta (VSB No. 44590)
Samuel W. Yergin (VSB No. 93862)
HOGAN LOVELLS CADWALADER US LLP
8350 Broad Street, 17th Floor
Tysons, VA 22102
Tel: 703-610-6100
Fax: 703-610-6200
jon.talotta@hlc.com
samuel.yergin@hlc.com

Michael E. DeLarco (*pro hac vice*)
HOGAN LOVELLS CADWALADER US LLP
390 Madison Ave.
New York, NY 10017
Tel: 212-918-3000
Fax: 212-918-3100
michael.delarco@hlc.com

Andrew T. Simmons (*pro hac vice*)
HOGAN LOVELLS CADWALADER US LLP
1735 Market St., Twenty-third Floor
Philadelphia, PA 19103
Tel: 267-675-4600
Fax: 267-675-4601
andrew.simmons@hlc.com

*Counsel for Plaintiff*

<u>*/s/ Nicholas M. DePalma*</u>
Nicholas M. DePalma (VSB No. 72886)
Taylor S. Chapman (VSB No. 81968)
Christian R. Schreiber (VSB No. 89544)
VENABLE LLP
1850 Towers Crescent Plaza, Suite 400
Tysons Corner, VA 22182
(703) 760-1600 (phone) / (703) 821-8949 (fax)
nmdepalma@venable.com
tschapman@venable.com
crschreiber@venable.com

*Counsel for Defendants CWCapital Asset Management LLC and David King*